John L. Dickinson *v.* R. E. Talbott, *Treasurer, et al.*

(No. 7680)

Submitted June 26, 1933.   Decided June 27, 1933.

2

*Brown, Jackson & Knight* and *R. G. Kelly,* for appellant.

*Homer A. Holt,* Attorney General, and *R. Dennis Steed,* Assistant Attorney General, for appellees.

MAXWELL, PRESIDENT:

This suit challenges the constitutionality of an act of the Legislature (Chapter 58, House Bill No. 208), First Extraordinary Session 1933, authorizing the issuance of state bonds in the sum of five million dollars to discharge "indebtedness of the state existing by reason of casual deficits in the treasury to the account of the 'general revenue' and 'capitol building' funds occurring in the present and prior fiscal years."

The plaintiff, a taxpayer of the state, residing in the county of Kanawha, sues on behalf of himself and all others who may join in the suit. He alleges that the auditor and the treasurer of the State of West Virginia are about to issue and offer for sale five million dollars of bonds of the state under said legislative enactment. Alleging that said act is unconsti-

tutional because in contravention of sections 4 and 5, Article X, West Virginia Constitution, he prays that the said officials be enjoined from issuing such bonds and offering them for sale. The defendants demurred to the bill and answered the same. Thereupon, upon consideration of the cause on the pleadings and on evidence adduced on behalf of the defendants, the trial chancellor overruled plaintiff's motion for an injunction and dismissed his bill. From the said decree, an appeal was awarded plaintiff by one of the judges of this Court.

The provisions of the State Constitution invoked are as follows:

> "No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years." Sec. 4, Art. X, Const.

> "The power of taxation of the Legislature shall extend to provisions for the payment of the State debt, and interest thereon, the support of free schools, and the payment of the annual estimated expenses of the State; but whenever any deficiency in the revenue shall exist in any year, it shall, at the regular session thereof held next after the deficiency occurs, levy a tax for the ensuing year, sufficient with the other sources of income, to meet such deficiency, as well as the estimated expenses of such year." Sec. 5, Art. X, Const.

In respect of the latter clause of said section 5, the plaintiff takes the position that if there was a deficit in the general revenue and capitol building funds for each of the fiscal years within the period beginning July 1, 1929, as recited in the preamble of the said act, it was the duty of the legislature to levy taxes to take care of such deficiency; that under said constitutional provision deficiencies in revenue must be taken care of in the manner therein provided for, to the exclusion of all other methods.

In respect of the provisions of said section 4, plaintiff takes

the position that a failure of revenue in either the general fund or the capitol building fund is not a casual deficit within the meaning of the phrase as employed in said section, notwithstanding the legislature in the preamble of said act declared the existing deficit to be "casual" within the meaning of said constitutional provision. Further, plaintiff says there is no "previous liability" of the state to be redeemed, within the meaning of said section.

Giving consideration first to the pertinent provision of section 5, Article X of the Constitution, it is to be noted that although the latter part of said section clearly imposes upon the legislature the duty of laying levies to take care of deficits, in furtherance of a pay-as-you-go method and in order to avoid the accumulation of indebtedness for current expenditures of the state, the fact remains that for the years 1929 to 1933, inclusive, such provision was not made. The said period has embraced one of the most serious financial depressions in the history of our nation, and as a consequence the revenues of this state have been so seriously affected that the accumulated deficits for the years mentioned now aggregate more than five million dollars. The debts have been honestly incurred and the integrity of the state is pledged for their discharge. More than half of this indebtedness is represented by loans made to the state by banking institutions both within and without the state, and the residue is represented by various transfers which have been made to the general fund of the state from special funds not intended for use in the payment and discharge of ordinary expenses of the state.

Legislative attempts to comply with the said constitutional requirement were unavailing. The receipt of revenue by the state was in precipitous decline because of the financial depression in the state and nation. Therefore, despite legislative effort, there resulted a condition not in keeping with the constitutional intent that deficiencies in revenue be absorbed by current taxation. This does not mean, though, that indebtedness of the state shall be repudiated because levies have not been laid by the legislature to cover the deficits as they became known. Nor does it mean that the discharge of such indebtedness may not be met in a manner most convenient and practi-

cal and imposing the least hardship on the people of the state, at the same time preserving the financial integrity of the state.

The state's constitutional requirements are for the preservation of the state and the maintenance of its integrity and for the protection of the people. Constitutional limitations must not be so construed as to be subversive of their very purpose. We conclude, therefore, that the directions prescribed in the latter part of section 5, Article X of the Constitution, do not preclude the issuance of bonds of the state to refund indebtedness which has been incurred by the state as an incident of a deficiency of revenue, the legislature having failed to provide funds by taxation to meet the deficiencies.

Under a constitutional provision which provides that "whenever it shall happen that the ordinary expenses of the State for any year shall exceed the income of the State for such year, the General Assembly shall provide for levying a tax for the ensuing year sufficient, with other sources of income, to pay the deficiency of the preceding year together with the estimated expenses of the ensuing year", the supreme court of South Carolina, in the case of *Lott* v. *Blackwood,* 164 S. E. 439, held that where deficits arose and were not met by taxation as contemplated by said constitutional requirement, the right of the legislature to provide for the financing of such indebtedness by the issuance of funding notes of the state is not precluded by said constitutional provision.

Recurring now to section 4, Article X of the Constitution, it is to be observed that the said section does not place a ban upon the contracting of debt by the state for the purpose of meeting casual deficits in the revenue or of redeeming previous liability of the state, of suppressing insurrection, repelling invasion or defending the state in time of war. The only phases of that section with which we are concerned pertain to casual deficits in the revenue and the redemption of previous liability of the state. Is the plaintiff's contention well taken that the deficits involved are not "casual" within the meaning of said constitutional provision? The dictionaries define "casual" as happening without design and unexpectedly; coming by chance; coming without regularity; incidental; fortuitous; unforeseen; unpremeditated. We are impressed

that these definitions fit exactly the situation for which the said legislative act makes provision.

The annual deficits (1929 to 1933) came about because of declining receipts by the state through taxation, incident to the great financial and economic depression which through that period has involved most of the civilized world. This decline of revenue was not forseen, it was not premeditated, it came without design and unexpectedly. It came by chance. It was casual. The people of the state made their Constitution for their welfare and protection and for the perpetuation of their state government. The phraseology employed in the section under consideration indicates that the framers of the Constitution anticipated that emergencies might arise in the state's finances when it would be necessary for indebtedness to be incurred by the state, and therefore provisions were made that such conditions might properly be met if and when they should arise. We are impressed that a contrary construction would be narrow and constrained and not conducive to the welfare of the state or her people.

Under a similar constitutional provision in the state of Indiana, the Supreme Court of that state held in the case of *Hovey, Governor, v. Foster*, 21 N. E. 39, that where, in the exercise of its sound discretion, the legislature, without any apparent purpose to evade the constitution, determined that a casual deficit had arisen and authorized a debt to be contracted to meet the same, "unless it is plainly apparent that the contingency did not exist which justified the exercise of the power, the action of that body is not subject to review, or liable to be controlled by the judicial department."

We are of opinion also that legislative justification of the five-million-dollar bond issue is based not only on the existence of casual deficits within the meaning of section 4, Article X of the Constitution, but as well on the existence of "a previous liability of the State" within the meaning of said section. The unanticipated decline in receipts of public revenue produced first the deficits in such revenue and then, to meet the same, indebtedness was incurred by the state as hereinabove stated. The suggestion in argument that the redemption of "a previous liability of the State", within the mean-

ing of said constitutional provision, pertains only to indebtedness existing at the time of the adoption of the original constitution of the state is not well taken. The phrase is broad and comprehensive and in our judgment applies to any liability of the state existing at any time when the legislature in recognition of the same, regardless of when it arose, adopts a plan for the refunding and eventual discharge thereof. When, by reason of casual deficits in the revenue of the state, the state incurs liability in the discharge of indebtedness incident to such deficits, such liability may be funded by state bonds for the issuance of which provision is made by legislalative enactment, on the basis of the redemption of "a previous liability of the State" within the meaning of section 4, Article X, West Virginia Constitution.

Apropos of both sections 4 and 5, Article X, West Virginia Constitution, it is not to be considered that the framers of our Constitution, or the people of the state in ratifying and approving the same, meant to place barriers in the path of the state officials and the legislators, so circumscribing the fiscal affairs of the state as to create impossibility of escape from embarrassing situations. Every person who has given the subject any thought knows that it is the policy of our state, as emphasized by our Constitution, that ordinary expenses of government shall be paid out of current revenues, that shortages in such revenues shall be taken care of through immediate taxation and that debt shall not be incurred by the state except in circumstances of great emergency. That we are now confronted with just such emergency, we have no doubt. Happily, the foresight of our forbears has placed in our Constitution provisions designed to meet, without embarrassment to the state, just such situations.

The preamble of said act authorizing the issuance of five million dollars of bonds contains a further recital that inasmuch as the indebtedness sought to be refunded existed prior to the adoption of the amendment of section 1, Article X of the State Constitution, at the general election of 1932, "levies in excess of the maximum levies provided for in said amendment to the Constitution may be laid to discharge said indebtedness and the interest thereon." True, the said indebtedness,

in large measure, was existent at the time of the adoption of said amendment, but it was not evidenced by bonds. There is an exception in the amendment which reads: "After the year 1933, the rate of the state tax upon property shall not exceed one cent upon the hundred dollars valuation, except to pay the principal and interest of bonded indebtedness of the state now existing." Clearly, that exception is not applicable herein. But the non-applicability of that exception is not controlling of the raising of funds to discharge the indebtedness here involved because, as stated in our case of *Finlayson v. City of Shinnston*, 113 W. Va. 434, 168 S. E. 479, the levy limitations prescribed by said amendment cannot be destructive of contractual obligations. That observation was there made specially with reference to bonded indebtedness of a municipality, but the same principle, of course, applies with respect to solemn debts of the state, whether evidenced by bonds or otherwise.

The State of West Virginia is sovereign save only as it has relinquished certain prerogatives to the federal government. In the exercise of the sovereign attribute of enacting laws the legislative power is inherent; therefore, in construing an act of the state legislature, reference must be had to the state and federal constitutions, not in search of a grant of power, but to ascertain if there is limitation or restriction of power. *State Road Commission v. Kanawha County Court*, 112 W. Va. 98, 163 S. E. 815. In the act under consideration the legislature, in our judgment, has not violated any constitutional limitation of its authority but has properly acted under its broad and plenary power to provide for the welfare of the state.

It was suggested in oral argument that if the act is upheld, any legislature at any time may direct the issuance of bonds to meet shortages in the income of the state, and thereby the pay-as-you-go plan of the Constitution will be destroyed. This proposition is a non sequitur. The instant act was passed because of a great and unusual emergency. Therein alone is there justification for the enactment. Only on similar basis could any subsequent bond issue be upheld. It is a canon of law that officials will perform their duty. We cannot assume that the legislature will at sometime pass a similar act unless

another grave emergency justifies it. Neither the legislature nor the courts would approve an issue that was not grounded on the plainest necessities.

We affirm the decree of the circuit court.

*Affirmed.*