361 S.E.2d 474

**STATE ex rel. DEPARTMENT OF EMPLOYMENT SECURITY OF the STATE of WEST VIRGINIA**

v.

**A. James MANCHIN, as Treasurer of the State of West Virginia.**

No. 17937.

Supreme Court of Appeals of West Virginia.

Sept. 16, 1987.

Jackson, Kelly, Holt & O'Farrell, Charleston, for petitioner.

Ed Rebrock, Charleston, for respondent.

NEELY, Justice:

In 1936, the West Virginia Legislature recognized a cooperative system of employment security between the Federal and State Governments and formed the Department of Employment Security to act as agent of the State for the purpose of complying with Congressional acts establishing a national employment security system. *W.Va.Code*, 21A–2–16 [1936], as amended. *W.Va.Code*, 21A–2–16 [1971] now directs the Commissioner of the Department of Employment Security to:

"... cooperate with the United States Department of Labor to the fullest extent consistent with the provisions of this chapter, and ... take such action through the adoption of appropriate rules, regulations, administrative methods and standards, as may be necessary to secure to this State and its citizens all advantages available under the provisions of the "Social Security Act" which relate to unemployment compensation, the "Federal Unemployment Tax Act," the "Wagoner-Peyser Act," and the "Federal-State Extended Unemployment Compensation Act of 1970."

The national system of employment security, which pays unemployment compensation to unemployed workers, emerged at the apogee of the Great Depression. The federal government, in pursuit of the economic equity that was the hallmark of the New Deal, sought to alleviate the human suffering that naturally attended cyclical variations in employment through enactment of Title IX of the "Social Security Act" of 1935. Yet the federal structure of our government, providing as it does a system of dual sovereignty that reposes but limited powers in the federal government, created a theoretical obstacle to the inauguration of a national system of unem-

ployment compensation. Thus, in deference to considerations of both historical and practical federalism, Congress passed the "Federal Unemployment Tax Act" that had the effect of bludgeoning the States into establishing their own systems of unemployment compensation.

Under the "Federal Unemployment Tax Act," 26 U.S.C. § 3301 *et seq.*, there is levied on most employers a hefty federal tax; however, if the States establish a qualifying state system of unemployment compensation, a state's employers receive a credit equal to 90 percent of the federal tax against any tax owed to the federal government. 26 U.S.C. § 3304. Ironically, however, the federal government does not establish its own unemployment compensation plan to be implemented in those states that fail to establish qualifying state systems. Rather, the unemployment tax levied on employers simply goes into the Treasury of the United States without earmark—like other internal revenue collections. No reciprocal benefits in proportion to the employer taxes paid to the federal government are returned to states that fail to establish qualifying state employment security programs. Therefore, it is hardly surprising that all states—including West Virginia—immediately responded to the 1935 "Social Security Act" and its threat of a federal tax penalty by inaugurating qualifying unemployment compensation systems.

In *Steward Machine Co. v. Davis*, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937), the case that validated the national employment security system, the supreme court pointed out that the purpose of the federal tax was to solve the problem of competitive labor costs among different states. As Mr. Justice Cardozo pointed out for the court:

"But if states had been holding back before the passage of the federal law, inaction was not owing, for the most part, to the lack of sympathetic interest.

Many held back through alarm lest, in laying such a toll upon their industries, they would place themselves in a position of economic disadvantage as compared with neighbors or competitors.... Every dollar of new taxes will continue in all likelihood to be used and needed by the nation as long as states are unwilling, whether through timidity or for other motives, to do what can be done at home. At least the inference is permissible that Congress so believed, though retaining undiminished freedom to spend the money as it pleased."

301 U.S. at 588–589, 57 S.Ct. at 891.

In 1974, Congress passed the "Emergency Unemployment Compensation Act" [1] which allowed:

"Any State unemployment compensation law of which is approved by the Secretary of Labor under § 3304 of the Internal Revenue Code of 1954, which desires to do so, may enter into and participate in an agreement with the Secretary under this Act ..."

The following year, Congress amended the "Emergency Unemployment Compensation Act" of 1974 to coerce state participation:

"Notwithstanding any provision of the Emergency Unemployment Act of 1974, if any state shall fail or refuse, within a reasonable time after the date of the enactment of this act, to enter into such a modification of such agreement, the Secretary of Labor shall terminate such agreement." [2]

An integral part of the "Emergency Unemployment Compensation Act" is that extended unemployment compensation benefits will be paid by the State to idle workers in times of depression from funds borrowed from the federal government or from other funds of the State if the State's unemployment security account is exhausted. Publ.L. 93–572, Section 102–104 [1974].[3]

---

**1.** "Emergency Unemployment Compensation Act" of 1974, Pub. L. 93–572, 88 Stat. 1869; 26 U.S.C. § 3304 note.

**2.** Amendment of "Emergency Unemployment Compensation Act" of 1974, Publ. L. No. 94–12, Title VII § 701(b) [1975]; 26 U.S.C. § 3304 note.

**3.** The relationship among the "Federal Unemployment Tax Act," the "Federal–State Extended Unemployment Compensation Act" and the "Social Security Act" can easily confuse readers unfamiliar with the federal statutes regarding unemployment compensation. In 1935, Con-

Beginning in 1980, West Virginia suffered an economic recession of devastating proportions. By 1983, overall unemployment in the State rose to 18 percent,[4] but the human suffering that we experienced is insufficiently dramatized by that aggregate figure. In some counties, particularly in the major coal producing counties, the unemployment rate was often over 40 percent and in President Roosevelt's words, "the withered leaves of the industrial enterprise [lay] on every side, and the means of exchange [were] frozen in the currents of trade."

In desperation, the Commissioner of Employment Security, acting pursuant to agreements with the federal government required by 26 U.S.C. § 3304, borrowed money from the federal government under the mechanism provided by the "Federal Extended Unemployment Compensation Act." 42 U.S.C. § 1101. In the early years of our borrowing everyone earnestly prayed that the conditions that had precipitated the closing of our mines and related unemployment would be temporary. But, unfortunately, this was not the case. From 1981 to the present West Virginia incurred a debt of approximately $229,871,-754 in principal and $38,249,494 in interest for advances made by the federal government to the West Virginia Department of Employment Security. The federal government charges the State of West Virginia an annual rate of interest of 9.33 percent.[5]

This brief history of the national employment security system and our own unfortunate circumstances in the early 1980's is important for the resolution of this case. As a threshold matter, we must determine whether the obligations that are to be refinanced through the bonds that are the subject of this action, and which were incurred by the Commissioner of Employment Security pursuant to our State's agreements with the federal government under *Code* 21A–2–16 [1971], were required by the government of the United States. If they were so required, then they were authorized by the supremacy clause of the *Constitution of the United States.*

Ever since its inception, the "Federal Unemployment Tax Act" has been couched in permissive rather than mandatory terms; however, as a practical matter the federal government's permissive terms are rather like the alternatives announced by the traditional highwaymen: "Your money or your life!" Although, indeed, West Virginia *could* have chosen not to enter into a qualifying agreement with the federal government establishing a state system of employment security, the tax consequences of such a decision would have been tantamount to political and fiscal suicide. Accordingly, although the current state system of employment security was not explicitly *required* by federal statute, the degree of coercion employed through the taxing power of the United States was such that for all intents and purposes our employ-

---

gress passed the omnibus "Social Security Act" which is the foundation of both the "Federal Unemployment Tax Act" and the "Federal–State Extended Unemployment Compensation Act." The 1935 "Social Security Act" as amended is codified at both Title 26 and Title 42 of the *United States Code.* Generally, 26 U.S.C. § 3301 *et seq.,* addresses who is to be taxed and the amount of the tax. Title 42 U.S.C. § 1101 *et seq.,* administers the revenues derived from the tax and distributes them among the participating state unemployment funds.

**4.** "Unemployment in States and Local Areas," U.S. Department of Labor: West Virginia Notebook, 1983.

**5.** *See* 42 U.S.C. § 1322(b)(4) [1983]. The interest attributed to any fiscal year must be repaid before the first day of the following fiscal year. 42 U.S.C. § 1322(b)(3)(A) [1983]. Unlike the

principal, the interest on advances may not be paid out of the federal unemployment account of the state. 42 U.S.C. § 1322(b)(5) [1983]. Thus, in the absence of a special provision, interest must be paid out of the state's general revenues. The interest rate is calculated in accordance with 42 U.S.C. § 1322(b)(4) [1984]. A special provision of the Social Security Act allows West Virginia to repay interest that became due in 1983, 1984 and 1985 in five installments over the four years succeeding the year in which the interest became due. 42 U.S.C. § 1322(b)(8)(A)[1983]. The final installment from the State of West Virginia of this interest obligation is due on September 30, 1989. No interest accrues on this deferred interest before the date on which it is due. 42 U.S.C. § 1322(b)(8)(A) [1983].

ment security system was and is required in its entirety by the federal government.

The Court holds today that the actions of our State government that have led us to borrow hundreds of millions of dollars to fund the employment security program were undertaken pursuant to supreme federal law. If, indeed, the federal statutes are not expressly worded in mandatory terms, they are sufficiently coercive to be within the penumbra of the supremacy clause of the *Constitution of the United States* and the actions of the legislative and executive branches in complying with the federal requirements are insulated from West Virginia constitutional challenge by virtue of the supremacy clause.[6]

In 1987, the Governor proposed to the West Virginia Legislature that a special tax be imposed to retire our obligations to the federal government and that the State issue tax free bonds bearing interest at a rate of approximately 5.5 percent for the purpose of retiring our entire debt to the federal government and reducing our interest charges on money due the federal government by approximately $50,000 a day. In response to this executive initiative, the legislation passed *W.Va.Code,* 21A–8A–1 [1987] *et seq.,* "The Debt Fund Act." The complete implementation of "The Debt Fund Act," with immediate refinancing of the principal of the federal debt over a period of five years, as opposed to repayment over the otherwise estimated ten-year repayment period, will result in a probable savings of over $140,000,000. In addition, the new refinancing will include the deferred interest payment of approximately $15,000,000 due September 30, 1987, which would otherwise be payable from general revenue of the State.[7]

The bonds that are to be issued under "The Debt Fund Act" are to be repaid from revenues received from assessments upon employers and employees pursuant to *W.Va.Code,* 21A–8A–8(c) [1987]. "The Debt Fund Act" provides that the revenues obtained by the tax on employers and employees shall be paid into a special, non-revolving revenue fund created in the State Treasury. *W.Va.Code,* 21A–8A–2 [1987]. All revenues received from the tax imposed by "The Debt Fund Act" are pledged to the repayment of bonds or notes issued under "The Debt Fund Act" as they become due, *W.Va.Code,* 21A–8A–8(c) [1987], but the general credit of the State is not, in any way, to be pledged, *W.Va.Code,* 21A–8A–8(b) [1987]. It is only money collected under the tax levied by "The Debt Fund Act" that is pledged to the repayment of principal and interest on the bonds issued pursuant to "The Debt Fund Act."

The case before us now is a bond mandamus to determine whether under *W.Va. Const.,* art. X, § 4, the State Treasurer may implement "The Debt Fund Act" by establishing a special account as required by "The Debt Fund Act" for that purpose. The Treasurer asserts that the issuance of bonds by the State without constitutional amendment is a violation of *W.Va.Const.,* art. X, § 4. We disagree with the respondent Treasurer and hold that "The Debt Fund Act," in its entirety, is constitutional under the *Constitution of the State of West Virginia* and the *Constitution of the United States* and the bonds may legally be issued.

### I

*W.Va. Const.,* art. X, § 4 provides:

the federal government in the absence of either a mandatory federal statute or proper compliance with *W.Va. Const.,* art. X, § 4. In this regard, it need hardly be pointed out that this case presents an extraordinary set of facts that are unlikely to be repeated.

7. We are aware of *Dickinson v. Talbott,* 114 W.Va. 1, 170 S.E. 425 (1933). However, our debt to the federal government in the present case is not a "casual deficit" within the meaning of *W.Va.Const.,* art. X, § 4.

---

6. *See Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) for recognition that the *U.S. Constitution* has penumbras formed by emanations (whatever an "emanation" might be). 381 U.S. at 484, 85 S.Ct. at 1681. If ever there were an "emanation," however, it has to be the threat by the federal government to tax the lifeblood out of the citizens of a state with no corresponding benefit to the citizens of that state if the state fails to do what the federal government wants. Nothing in this opinion, however, should be construed to authorize the executive to borrow money from

"No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years."

*W.Va. Const.,* art. X, § 4 explicitly permits a State debt to be contracted "to redeem a previous liability of the State." Furthermore, there is no question that the money borrowed from the federal government pursuant to our qualifying agreement with the Secretary of Labor under 26 U.S.C. § 3304 is a valid, existing debt of the State. In *United States of America v. State of West Virginia,* 764 F.2d 1028 (4th Cir. 1985), aff'd 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987), the federal court held that money borrowed from the federal government in order to cope with a State emergency is a valid debt due and payable to the federal government notwithstanding any State constitutional provision to the contrary. Thus, even if our original borrowing had not been within the penumbras of the supremacy clause, there is no question that now that the money has been received and disbursed, the supremacy clause makes it a binding debt of the State to the United States government.[8]

Thus, having determined that there is a pre-existing liability of the State that in one way or another must be repaid to the federal government, we find no impediment in *W. Va. Const.,* art. X, § 4 to the issuance of the bonds authorized by "The Debt Fund Act" to reduce the total cost of repaying that existing liability.

**8.** In *United States of America v. State of West Virginia, supra,* the United States brought an action against West Virginia for reimbursement of costs incurred for installing temporary housing for flood victims of the 1972 Buffalo Creek Mining disaster. The circuit court held that the contract whereby the State agreed to reimburse the federal government for costs incurred during the installation of the temporary housing was valid and binding on the State. The circuit court cited with approval the District Court which said:

"Disasters are not confined in their impact by State boundaries, nor do they often give

**II**

The respondent State Treasurer also asserts that "The Debt Fund Act" is unconstitutional because it violates equal protection principles by establishing an irrational class of persons who are subject to the payment of the tax. In this regard the Treasurer points out that "The Debt Fund Act" collects tax revenues only from employers and wage earners. Yet this type of equal protection objection has been roundly rejected by the Supreme Court of the United States in *Carmichael v. Southern Coal & Coke Co.,* 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1937), where the Court held that a state statute imposing a tax upon employers to support the State Unemployment Compensation Fund did not create an unconstitutional classification because employers of eight or less employees were exempted from the tax. The Court said:

This Court has repudiated the suggestion, whenever made, that the Constitution requires the benefits derived from the expenditure of public monies to be apportioned to the burdens of the taxpayer, or that he can resist the payment of the tax because it is not expended for purposes which are peculiarly beneficial to him.

*Id.,* 301 U.S. at 522, 57 S.Ct. at 879; *See also Steward Machine Co. v. Davis, supra.*

The mere failure of some members of a class that is taxed to reap a full share of benefits from the tax in proportion to their contributions is not a valid basis for rejecting the classification as unconstitutional under either the equal protection requirements of the Fourteenth Amendment

sufficient warning to enable relief planners to sort out foreseeable legal problems. To be effective, the federal government must move with celerity.... It cannot afford the time required to draft agreements which take into account each State's laws. Treating the federal administrators as if they had time to do so would be unreasonable. In short, uniformity under these circumstances is essential, given the nature of the program and the prospect of frustrating its objectives if State law controls." 537 F.Supp. 388, 396 (1982).

to the *Constitution of the United States* or analogous state constitutional provisions. Syllabus Point 5, *United Fuel Gas Co. v. Battle,* 153 W.Va. 222, 167 S.E.2d 890, appeal dismissed, 396 U.S. 116, 90 S.Ct. 398, 24 L.Ed.2d 309 (1962).

### III

■ The respondent Treasurer also challenges the authority of the Commissioner of Employment Security to pay the cost of issuing bonds under "The Debt Fund Act," including but not limited to the cost of credit enhancement, from the bond proceeds. *W.Va.Code,* 21A–8A–3 [1987] standing alone, provides that the proceeds of any bonds issued pursuant to "The Debt Fund Act" be "used solely for the repayment of advances and interest under the provisions of Title 42 U.S.C.A. § 1321." Thus the respondent Treasurer asserts that "The Debt Fund Act" itself precludes the payment of the cost of the issuance of the bonds from the bond proceeds. We reject this argument because it would lead to an interpretation of the entire "Debt Fund Act" that totally defeats the Act's legislative purpose and confounds all rational expectations.

There are necessary costs attendant to the issuance of bonds. Preeminent among these costs is the cost of credit enhancement, which is simply a bond insurance policy or letter of credit. Such credit enhancement adds, as security for the bonds, the promise of a commercial bond insurance company or bank to pay principal and interest on the bonds if the issuer, in this case Department of Employment Security, defaults.

The insurer (or issuer of the letter of credit), of course, charges a fee for its promise. The effect of this insurance or letter of credit is, after taking into account the cost of the insurance, to lower the interest rate on the bonds and reap a substantial net saving to the issuer above and beyond the cost incurred for the credit enhancement. The cost of this insurance is commonly paid from the bond proceeds as are other administrative costs naturally attendant upon any bond issue.

"The Debt Fund Act" as a whole requires the Commissioner of the Department of Employment Security to do whatever is necessary to finance the repayment of advances made by the federal government through the issuance of bonds or notes. The failure of § 3 of "The Debt Fund Act" specifically to mention everything that is necessary for the issuance of the bonds does not reflect a conscious determination by the Legislature that the costs of issuance are not to be paid from the bond proceeds. In fact, it is obvious that because no specific appropriation was made from general revenue funds for this purpose, the Legislature intended that part of the bond proceeds would be used to pay all ordinary and necessary expenses. In this regard it is perhaps illuminating to note that *W.Va.Code,* 21A–8A–3 [1987] specifically provides "[t]hat competitive sealed bids shall be used to determine the bond issuance agent." Therefore, the Legislature did provide a system for minimizing the costs of the issuance and must have contemplated that bond proceeds would be used for that purpose.

■ We have generally held that actions that are necessarily implied by a statute, or that must be included in it in order to make its terms effective, are as much a part of the statute as if they had been declared in express terms. *See Smith v. State Workmens' Compensation Commissioner,* 159 W.Va. 108, 219 S.E.2d 361 (1975). In construing a statute, the whole should be examined with a view to arriving at the legislative intent in enacting each of its parts. *Harbert v. Harrison County Court,* 129 W.Va. 54, 39 S.E.2d 177 (1946). A review of "The Debt Fund Act" as a whole reveals that the Commissioner of the Department of Employment Security is empowered to do whatever is necessary to affect the refinancing of advances made by the federal government by the issuance of notes or bonds. Thus *W.Va.Code,* 21A–8A–1(a) provides:

"For the *single purpose* of financing the repayment of funds advanced to the Department of Employment Security by the federal government ... the Commis-

sioner ... is authorized ... to borrow money and issue revenue bonds...."

Section 1 further provides that: "the Commissioner shall *provide* for the issuance of such notes or bonds in such principal amounts and upon such terms *as* shall be *necessary* to provide sufficient money for repaying, in whole such funds advanced by the federal government." [Emphasis supplied] *Code*, 21A–8A–1(b).

We hold, therefore, that the ordinary, necessary and reasonable expenses of issuing the bonds authorized by "The Debt Fund Act," including but not limited to the costs of credit enhancement, may be paid from the proceeds of the bonds.

### IV

■ Respondent asserts that *W. Va. Code*, 21A–8A–8 [1987] unconstitutionally delegates authority to the Commissioner of Employment Security to establish tax rates upon employers and employees "at a level sufficient to generate the revenues to retire the bonds or notes issued pursuant to this article and to pay deferred interest owed to the federal government when due, subject only to the limitation established in the proceedings subsection (a) of this section." Subsection (a), in turn, limits the special assessment to 35/100 of 1 percent of employees' gross wages and an assessment to be contributed by employers in an amount that is sufficient to cause the total statewide assessment on employers to equal the total statewide assessment imposed upon employees.

We hold that although the Commissioner is vested with discretion, "The Debt Fund Act" in its entirety establishes rational standards to instruct the Commissioner's use of discretion. The Act simply imposes upon the Commissioner the duty to establish an assessment that is appropriate for the retirement of the bonds. The determination of such an assessment is only an exercise in actuarial mathematics and does not involve an unconstitutional delegation to the Commissioner of the taxing power. Indeed, the standards are sufficiently clear that if the Commissioner abuses his statutory discretion and either over or under

assesses employers and employees, any member of the affected class can challenge such abuse of discretion in court, where judges can quickly determine from the standards established by "The Debt Fund Act" whether there has been an abuse of discretion. For that reason we find no constitutional infirmity in the Act because of its delegation of authority to establish assessment rates in the Commissioner of Employment Security.

### V

■ As an ancillary matter to respondent's argument that the Commissioner is delegated unconstitutional authority, the respondent argues that the casual reference to the establishment of a "reserve fund" in *W. Va. Code*, 21A–8A–2(c) is not a sufficiently specific delegation to the Commissioner of authority to establish the tax assessment at a rate greater than that required to retire the bonds when due. Apparently the respondent believes that the Commissioner's authority to create a reserve fund necessarily acknowledges the vagueness of the statute and results in vesting unbridled discretion in the Commissioner to establish an assessment rate sufficient to fund any reserve that he imagines to be necessary.

In light of the vagaries of the economy and the unpredictability of state revenues from year to year, however, the creation of a reasonable reserve fund to pay bonds or notes as they mature is obviously a necessary piece of machinery for the orderly liquidation of "The Debt Fund Act's" indebtedness. The Act contemplates that the Commissioner will establish a reasonable reserve, and although the concept of "reasonableness" involves a certain inherent elasticity, it is, nonetheless, sufficiently specific to provide guidance not only to the Commissioner initially, but also to the courts that may be required to entertain a challenge to his actions.

Accordingly, for the reasons set forth above, the writ of mandamus for which the petitioner prays is awarded.

Writ awarded.

McGRAW, C.J., and McHUGH, J., dissent and reserve the right to file a dissenting opinion.

McHUGH, Justice, dissenting:

I understand the goal of the majority in this case. Most West Virginians are aware of the fiscal plight of our State. That understanding and awareness, however, does not excuse the breaking of constitutional barriers as has been done in the majority's opinion. Often in our quest to obtain an immediate alleviation to our woes, we lose our long-term perspective. This, I fear, is the dilemma of accepting the short-term palliative being offered by the legislative and executive branches of our state government in circumventing the stringent requirements of art. X, § 4 of the *West Virginia Constitution.* Acquiescence by a majority of this Court has made such action possible. Generations of West Virginians which follow us will bear the burdens of our "pass along" concept of management of government finances. This "pass along" concept was the very evil sought to be precluded by art. X, §§ 4 and 5 of our Constitution, which were adopted in 1863 and readopted in 1872.

The history of art. X, § 4 of the *West Virginia Constitution* indicates that the constitutional framers were very concerned with limiting the debt to be contracted by the State, the circumstances under which it would be permissible to incur a debt without constitutional amendment, and payment of a debt. 1 *Debates and Proceedings of the First Constitutional Convention of West Virginia 1861–1863,* at 59, 547–48; 2 *Id.,* at 159–60; 3 *Id.,* at 127–35, 878. "[T]he question is whether our government is going into a system of large expenditures by the State to run up a debt and inflict burdens on this people that they must stagger under for the next three or four generations in order to obtain them." 3 *Id.,* at 131 (Delegate Van Winkle).

The majority opinion relies upon the exception in *W.Va. Const.* art. X, § 4 which allows the State to contract a debt "to redeem a previous liability of the State[.]" The meaning of this language was set forth in *Dickinson v. Talbott,* 114 W.Va. 1, 170 S.E. 425 (1933). Syllabus points 1 and 4 of *Dickinson* clearly limit the meaning of "a previous liability of the State" to indebtedness incident to casual deficits in state revenues as ascertained and declared by the legislature. There has been no such declaration here. The majority accepts the logic of *Dickinson v. Talbott,* but rejects the premise. The authorization of the funding scheme in this case to finance revenue bonds "to redeem a previous liability of the State" is clearly unconstitutional by any reasonable interpretation. In lieu of the legislature declaring a casual deficit, a constitutional amendment authorizing such action would be the appropriate alternative.

Footnote number 6 of the majority opinion "point[s] out that this case presents an extraordinary set of facts that are unlikely to be repeated." The same "unusual emergency" rhetoric appears in *Dickinson v. Talbott,* 114 W.Va. at 8, 170 S.E. at 429. The optimism of the majority opinion may be short-lived.

In an admittedly difficult predicament, what a majority of this Court has done in this case is to "bail out" the legislative and executive branches of state government. Those branches have well defined constitutional duties in relation to the fiscal affairs of our State. A competent entrepreneur looks beyond the immediate "cash flow" needs. Similarly, those in control of state government finances must not yield to the temptation of taking a bite from the apple without understanding the long-term consequences.

Primarily, for these reasons I dissent.

McGRAW, C.J., joins in this dissent and reserves the right to file a further dissenting opinion.