607 S.E.2d 424

**The Honorable John D. PERDUE, Treasurer of the State of West Virginia, and the Honorable Glen B. Gainer, III, Auditor of the State of West Virginia, Plaintiffs Below, Appellants**

**v.**

**The Honorable Bob WISE, Governor of the State of West Virginia, and Tom Susman, as Acting Secretary of the Department of Administration of the State of West Virginia, Defendants Below, Appellees.**

**No. 31749.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 1, 2004.

Decided Dec. 1, 2004.

Darrell V. McGraw, Jr., Attorney General, Silas B. Taylor, Senior Deputy Attorney General, Charleston, for the Appellants.

Stephen P. Goodwin, Carte P. Goodwin, Raymond S. Franks, II, Goodwin & Goodwin, Charleston, for the Appellees.

William B. McGinley, Charleston, for Amicus Curiae, West Virginia Education Associa-

tion and West Virginia Association of Retired School Employees.

ALBRIGHT, Justice:

Appellants, the State Treasurer[1] and the State Auditor,[2] appeal from the March 1, 2004, order of the Circuit Court of Kanawha County granting summary judgment to Appellees, the Governor[3] and the Acting Secretary of the Department of the Administration,[4] in connection with the declaratory and injunctive action Appellants initiated to determine whether issuance of $3.9 billion in general revenue bonds pursuant to the Pension Liability Redemption Act (the "Act")[5] is in violation of our state constitution. Upon our careful review of the issues presented against the record of this case, we determine that the lower court was in error in ruling that the Act does not run afoul of the constitutional provision that prohibits the state, as a general rule, from incurring debt.[6] Because we do not find any exceptions to the constitutional debt prohibition to be applicable, we are compelled to conclude that such a funding mechanism cannot be undertaken absent express approval by the citizens of this state in the form of a constitutional amendment. Accordingly, we reverse the ruling of the circuit court on the specific grounds that the issuance of general revenue bonds pursuant to the Act would be in violation of section four, article ten of the West Virginia Constitution.

## I. Factual and Procedural Background

In July 2003, Appellants filed a complaint with the circuit court through which they sought to preclude the Governor's issuance of certain general obligation bonds and to have the Act authorizing the issuance of the bonds declared unconstitutional. Under the statutory scheme challenged by Appellants, bonds in the amount of $3.9 billion were to be issued by the State, with the proceeds from the bond sale[7] credited to three public re-

---

1. John H. Perdue.

2. Glen B. Gainer, III.

3. Bob Wise.

4. Tom Susman.

5. W.Va.Code §§ 12–8–1 to –16 (2002) (Repl. Vol. 2004).

6. See W.Va. Const. art. X, § 4.

7. Before any proceeds can be realized however, an initial $39 million, or 1% of the bond amount issuance, is permitted under the Act to be

tirement systems.[8] The interest bearing bonds were to be issued as general obligations of the state that would be repaid from the general revenues of the state over a period of twenty-five to thirty years. The bond sale proponents envisioned that investment of the proceeds would yield income in excess of the interest payable on the bonds and thereby enable the state to reduce its future annual appropriations for the three pension systems. Opponents of the plan stressed that the investment plan contemplated by the Act necessarily includes the possibility of sustaining substantial losses due to stock and money market fluctuations. They raised the possibility that, rather than reducing future appropriations, the bond sale could have the opposite result, if due to poor performance, the state has to pay any part of the debt costs associated with the bond issuance while also having to meet the annual appropriations required to support the three pension plans at issue.

The three systems addressed by the Act are the Judicial Retirement System,[9] the State Troopers Retirement System,[10] and the Teachers Retirement System.[11] The parties agree that the three retirement systems at issue are actuarially sound, which means that their existing assets combined with the future employee and presently required future employer contributions are sufficient to pay the obligations of the systems as they become due at the present time.

What the Act and the attempted bond issuance are aimed at addressing is an accounting projection referred to as the "unfunded actuarial accrued liability," ("UAAL"),[12] which is essentially the excess of the actuarial accrued liability [13] of the respective pension funds over the actuarial value of their assets.[14] As of June 30, 2003, the valuation performed by the Consolidated Public Retirement Board's actuary identified UAAL figures in the amounts of $44 million for the Judges Retirement System; $350 million for the State Troopers Retirement System; and $5.05 billion for the Teachers Retirement

---

charged as costs for purposes of paying the underwriters, brokers, bankers, and lawyers who prepared and marketed the bonds. *See* W.Va. Code § 12–8–4(c). Appellants represent that other costs will consume another $24 million before the remaining proceeds can be credited to one or more of the three public retirement systems. The interest payments on the bonds over their term is calculated at $2 billion.

8. Those systems are the Judicial Retirement System, the State Troopers Retirement System, and the Teachers Retirement System.

9. *See* W.Va.Code §§ 51–9–1 to –17 (Repl. Vol. 2000 & Supp. 2004).

10. *See* W.Va.Code §§ 15–2–26 to –51 (Repl. Vol. 2004).

11. *See* W.Va.Code §§ 18–7A–1 to –38 (Repl. Vol. 2003 & Supp. 2004).

12. Under the Act, the UAAL is defined as

the aggregate of the unfunded actuarial accrued liabilities of the pension systems, with the unfunded actuarial accrued liability of each pension system being calculated in an actuarial valuation report provided by the consolidated public retirement board to the department of the administration pursuant to section four [§ 12–8–4] of this article.
W.Va.Code § 12–8–3(19).

13. The term "actuarial accrued liability" ("AAL"), as defined by Scott L. Dennison, an actuary previously employed by the Consolidated Public Retirement Board, is essentially "the 'present value' of the difference between the estimated cost of future benefits less the estimated [regular] contributions expected in the future." In other words, the AAL is "a measure of future predicted shortfalls between the cash made available by anticipated future [regular] contributions relative to anticipated future benefit payouts, with these shortfalls being discounted to their present value." In relation to the AAL, the UAAL is simply the plan's AAL minus the plan's existing assets.

14. In the first amended complaint filed below, Appellants explained how the UAAL is determined by the West Virginia Consolidated Public Retirement Board:

[T]he Board's actuary estimates the total pension benefits, both accrued and unaccrued, that will be paid in the future to past and present employees based on their service to date and "discounts" these estimated benefits to their "present value" using an estimated, or assumed, rate of return on system assets. The result of this calculation is called the "Actuarial Accrued Liability." To the extent that the existing assets of the system fall short of the *estimated* present value of these *estimated* future benefits, the system is said to have an "Unfunded Actuarial Accrued Liability" equal to the amount of this shortfall.

System.[15] To address these massive unfunded liabilities,[16] the state is statutorily required to make supplemental appropriations that are recalculated annually to amortize the UAAL over a specific term.[17] While the state is at present meeting the funding obligations imposed by the supplemental appropriations required because of the UAAL, the concern remains, based on the projection of future appropriations required to keep the respective funds in actuarially sound condition, that these annual supplemental appropriations could eventually present an insurmountable funding burden for this state.

In recognition of these looming funding concerns, the Legislature enacted the subject statute in 2000 with the intention of pursuing the issuance of $3.9 billion in general revenue bonds for the stated purpose of "redeeming" the UAAL. The Act states specifically that it

provides for the redemption of the unfunded actuarial accrued liability of each pension system, which is a previous liability of the state, through the issuance of bonds for the purpose of: (i) Providing for the safety and soundness of the pension systems; and (ii) redeeming each such previous liability of the pension systems in order to realize savings over the remaining term of the amortization schedules of the unfunded actuarial accrued liabilities and thereby achieve budgetary savings.

W.Va.Code § 12–8–2(f).

In challenging the constitutionality of the Act, Appellants argued below that the Act violates the debt provision of the State Constitution which, barring certain exceptions, prohibits the state from incurring debt. *See* W.Va. Const. art. X, § 4. Appellants strongly dispute the applicability of the exception upon which both the Legislature and Appellees rely to support the investment plan contemplated by the Act—an exception that permits the state's credit to be extended for a "previous liability of the state." *Id.* In addition, Appellants challenge the Act on grounds of improper delegation of legislative power, asserting that the enactment fails to provide sufficient guidance for purposes of effectuating its provisions. Appellants further maintain that provisions of the Open Governmental Proceedings Act [18] were violated because public hearings were not held in connection with authorization of the subject bonds.

Upon its consideration of these issues, the circuit court relied upon case law charging the State with the responsibility of adequately funding its retirement systems to determine that the UAAL "is a legitimate debt that constitutes a 'previous liability of the State.'" Having declared an exception to the debt clause to be applicable, the circuit court proceeded to rule that "the Act's proposed bond issuance does not violate the constitutional debt limitation of W.Va. Const., art. X, § 4." The lower court also ruled in favor of Appellees with regard to the challenges raised by Appellants involving improper delegation of legislative power and violations of the Open Governmental Proceedings Act. Through this appeal, Appellants seek to have the Act declared unconstitutional based upon violation of the constitutional debt provision.

## II. Standard of Review

■ Our standard of review is de novo "[b]ecause interpretations of the West Virginia Constitution, along with interpretations of statutes and rules, are primarily questions of law." *Phillip Leon M. v. Greenbrier County Bd. of Educ.*, 199 W.Va. 400, 404, 484 S.E.2d 909, 913 (1996); *accord* Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va.

15. According to the statement of legislative purpose included in the Act, the UAAL resulted from "financial distress that occurred in the state during the 1980s." W.Va.Code § 12–8–2(c).

16. Based on the manner in which the UAAL is calculated, differing values can be assigned to the UAAL's for each of the three funds depending on factors such as current investment returns and application of the various demographic assumptions that are employed to arrive at the UAAL figures.

17. With regard to the Teacher's Retirement System, the annual sum is calculated with the goal of eliminating the UAAL by 2034 (*see* W.Va.Code § 18–9A–6a(c) (1997) (Repl. Vol. 2003)); with regard to the Judicial Retirement System, the target year is 2018; and with regard to the State Troopers Retirement System, the specified year is 2025.

18. W.Va.Code §§ 6–9A–1 to 6–9A–12 (1999) (Repl. Vol 2003).

138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."). Accordingly, our review of this matter is plenary.

## III. Discussion

■ At the core of this appeal is the fundamental question of whether issuance of the bonds authorized by the Act would violate the debt clause of the state constitution. That provision mandates that: "No debt shall be contracted by this State, except to meet casual deficits in the revenue, *to redeem a previous liability of the State*, to suppress insurrection, repel invasion or defend the State in time of war[.]" W.Va. Const. art. X, § 4 (emphasis supplied). In upholding the Act, the circuit court determined that the UAAL was a "previous liability of the State" based on prior decisions of this Court requiring adequate funding of public retirement systems. Upon analysis, however, we cannot agree with the lower court's conclusion that the bonds can issue without violating the debt clause under the guise of characterizing the UAAL as a "previous liability of the State." [19] W.Va. Const. art. X, § 4.

### A. Obligations Imposed on State by Public Pension Plans

A review of this Court's rulings concerning the obligations imposed on the state as a result of various public pension funds is necessary to understand why the bond sale authorized by the Act does not fall within the "previous liability" exception to the debt provision.[20] In *Booth v. Sims*, 193 W.Va. 323, 456 S.E.2d 167 (1995), this Court explained why the creation and operation of public retirement systems do not ordinarily create debt in violation of the state constitution:

> This Court concluded long ago that our pension systems do not involve the creation of an unconstitutional debt. *State ex rel. Board of Governors v. Sims*, 133 W.Va.

239, 244, 55 S.E.2d 505, 508 (1949). Although *Sims* did not discuss the rationale behind its reasoning on this issue, ... it should now be clear that pension systems are constitutional for the same reasons that special revenue bonds are constitutional: The pledge for the pension fund derives from the actuarially sound contributions of the employees and the Division; that is, the fund is expected to generate its own money to meet its eventual obligations. Because money is expected to be put away as a condition precedent to fund the system, pensions are legitimate debts of the State. Consequently, *W.Va. Const.* art. VI, § 51B(3)(d) requires the Governor to prepare a yearly budget that allows for payment of pensions as constitutionally created debt of the State.

193 W.Va. at 332–33, 456 S.E.2d at 176–77.

■ The mechanism that prevents the pension obligation from being unconstitutional in terms of its characterization as a debt is the expectation that the employee contributions plus the state/employer's statutorily specified contribution levels will provide sufficient funds to meet the required level of annual benefit payments. In syllabus point fourteen of *Booth*, we recognized the remedy that is available to a pensioner upon the state's failure to make pension installments:

> Because pensions are a lawful debt of the State, the proper remedy for any failure to pay a pension is a mandamus action against the state treasurer and auditor. The funding of any pension program is the legislature's problem-not the state employees' problem-and once the legislature establishes a pension program, it must find a way to pay the pensions to all employees who have substantial reliance interests.

193 W.Va. at 328, 456 S.E.2d at 172. As this Court explained in *Booth*, there is no enforceable cause of action by a retiree against the state treasurer or auditor *until* the funds

---

**19.** In light of this determination of unconstitutionality, we find it unnecessary to address Appellants' additional assignments of error.

**20.** We note that the Legislature attempted to resolve this issue in advance by including in the

legislative findings the statement that the UAAL "is a previous liability of the state." W.Va.Code § 12–8–2(e), (f). Analysis of this Court's prior decisions makes clear that we have never made such a determination.

are not available to pay the pension benefits to which retirees are statutorily entitled.

In the seminal case addressing the obligations of the State to meet its pension commitments, we acknowledged that "[t]he realization and protection of public employees' pension property rights is a constitutional obligation of the State." Syl. Pt. 18, in part, *Dadisman v. Moore* (*Dadisman I*), 181 W.Va. 779, 384 S.E.2d 816 (1988). We further recognized in syllabus nineteen of *Dadisman I* that "[t]he payment of statutorily promised pension benefits, on maturity, is a general and moral obligation of the State." *Id.* at 782, 384 S.E.2d at 819. We specifically identified the constitutional underpinnings for the protections that attach to the rights of public employees to receive statutorily established pension benefits. Those constitutionally mandated principles include protection from the impairment of contracts and require application of due process principles when modifications are sought that would affect the receipt of vested retirement benefits. Based on the contractual nature of such pension rights, the state is obligated to remit to public retirees those retirement benefits to which they are entitled by law. *See id.* at 791–92, 384 S.E.2d at 828–29.

### B. Public Debt versus "Prior Liability"

The events that precipitated the *Dadisman I* decision were the underfunding of the Public Employees Retirement System ("PERS") over a period of four years combined with the legislative transfer of funds originally appropriated for PERS to the general revenue fund. *See* 181 W.Va. at 785–86, 384 S.E.2d at 822–23. In *Dadisman I*, a retired public employee sought a writ of mandamus to ensure the proper funding of PERS and to obtain directives requiring the expedient imposition of fiscally sound management practices. In discussing the underfunding of PERS in *Dadisman I*, this Court declared that "[t]he amount of employer contributions earned by State employees *which have been wrongfully withheld or diverted over the past four years* is a *public debt,*

which must be repaid." *Id.* at 792, 384 S.E.2d at 829 (emphasis supplied). Recognizing the folly of borrowing from the PERS trust for the "purposes of political expediency," we rejected that practice as placing an assured and unwise "heavy tax burden on posterity." *Ibid.* In moulding relief for the misappropriations at issue in *Dadisman I*, we directed that an independent actuary be hired to determine whether such funding decisions had "rendered [PERS] actuarially unsound." *Ibid.* And, in the event that the retirement fund at issue was declared to be actuarially unsound, we required that an appropriation plan be developed to return PERS to actuarial soundness.

In response to this Court's directives in *Dadisman I*, the Legislature authorized an audit of PERS to determine whether the plan was actuarially unsound. The audit revealed that PERS was not rendered actuarially unsound by the underfunding in view of an amortization plan that involved replacement of wrongfully withheld or diverted appropriations from PERS over a sixteen-year period. *State ex rel. Dadisman v. Caperton* (*Dadisman II*), 186 W.Va. 627, 413 S.E.2d 684 (1991). Consequently, we recognized that PERS was not in need of further appropriations at this time to return the fund to soundness. After reemphasizing the Legislature's obligation to "timely and complete[ly] fund[ ] and proper[ly] appl[y] . . . all employer contributions to the employer accumulation fund of the PERS, without diversion to unauthorized purposes" we found the issue of adequate funding essentially mooted by the actuarial sound condition of the fund.[21] 186 W.Va. at 632, 413 S.E.2d at 689. We reached a similar result in the well-reasoned decision of *West Virginia Education Association v. Consolidated Public Retirement Board,* 194 W.Va. 501, 460 S.E.2d 747 (1995), in which we addressed the issue of inadequate funding of the Teachers Retirement System. Due to the passage of legislation aimed at correcting the unfunded liability over a period of forty years that included annual determinations of actuarial soundness, we found the funding

---

**21.** We cautioned, however, that "[t]his Court would order appropriate relief, including supplemental funding to restore underfunding or diverted funds, should any future violations be established which affect actuarial soundness of the PERS." 186 W.Va. at 632, 413 S.E.2d at 689.

issue mooted by the legislation.[22] *Id.* at 511, 460 S.E.2d at 757.

Significantly downplaying the historical underpinnings to the characterization of misappropriated funds as a "public debt" in *Dadisman I*, Appellees argue that this Court's recognition of a duty to repay those funds to PERS combined with the legislation at issue is sufficient to invoke the debt clause exception that permits extension of this state's credit for a "previous liability of the state." W.Va. Const. art. X, § 4. Further analysis of the law as it pertains to pension rights and payment obligations, however, demonstrates why this Court's acknowledgment of a "public debt" with regard to misappropriations that affected PERS—a retirement system that is not even at issue in this case—does not cause the UAAL identified with respect to the three retirement systems at issue here to rise to the constitutionally significant level of a "previous liability of the state" for purposes of involving this state's credit in the manner contemplated by the Act. *Id.*

The recognition by this Court in *Dadisman I* and *II* and in *Consolidated Public Retirement Board* that the respective retirement funds must be funded pursuant to statutory requirements which extend over a period of years does not entitle the Legislature to invoke the "previous liability" exception to the clear constitutional prohibition against incurring debt on the state's behalf. While the term "previous liability" is certainly subject to differing views,[23] we are certain that the mere designation of the state's obligation to continue to fund PERS, the teachers retirement funds, and by logical implication all other retirement systems that are statutorily established, does not fall within the ambit of what the constitutional drafters intended as a permissible basis for extending the state's credit. As Appellants aptly note, if recognition of an obligation to fully or adequately fund was the threshold test for invoking the "previous liability" exception, there are virtually no state funding obligations for which the reasoning upon which Appellees rely would not "justify" the use of an investment scheme such as that contemplated by the Act.[24]

### C. Enforceable Sum Specific Debt

Even a cursory review of the decisions of this Court in which the subject exception to article X, section 4 has been discussed and applied demonstrates that an obligation to fund is not the equivalent of a "previous liability" within the meaning of this state's debt clause. Significantly more than a moral obligation to pay is required to invoke the exception under discussion. In each case in which the "previous liability" exception has been examined and its application approved by this Court, there has been an existing sum specific indebtedness involved—an actual enforceable debt. In *Dickinson v. Talbott*, 114 W.Va. 1, 170 S.E. 425 (1933), we discussed how invocation of the "previous liability" exception to the debt clause is directly tied to the discharge of an indebtedness. Through that decision, this Court approved the issuance of state bonds

---

**22.** However, we encouraged the parties to return to the circuit court if the objectives of the legislative funding plan were not met. *Consolidated Pub. Retirement Bd.*, 194 W.Va. at 512, 460 S.E.2d at 758.

**23.** During oral arguments advanced during *Dickinson v. Talbott*, 114 W.Va. 1, 170 S.E. 425 (1933), it was posited that the term "pertains only to indebtedness existing at the time of the adoption of the original constitution." That interpretation was squarely rejected by this Court. *Id.* at 7, 170 S.E. at 428.

**24.** A related concern was articulated more than seventy years ago by opponents of legislation authorizing a bond issue to generate funds to repay almost $5 million in indebtedness incurred by the state due to insufficient tax receipts during the Depression:

It was suggested in oral argument that if the act is upheld, any legislature at any time may direct the issuance of bonds to meet shortages in the income of the state, and thereby the pay-as-you go plan of the Constitution will be destroyed. This proposition is a non-sequitur. The instant act was passed because of a great and unusual emergency. Therein alone is there justification for the enactment. Only on similar basis could any subsequent bond issue be upheld. It is a canon of law that officials will perform their duty. We cannot assume that the Legislature will at sometime pass a similar act unless another grave emergency justifies it. Neither the Legislature nor the courts would approve an issue that was not grounded on the plainest necessities.

*Dickinson*, 114 W.Va. at 8–9, 170 S.E. at 429.

for the purpose of discharging a specific indebtedness that resulted when the state, due to insufficient tax receipts and tax levying during the Depression, borrowed funds from various banks to meet the state's obligations and transferred funds from special funds not intended for general revenue purposes. Under the facts of *Dickinson*, two exceptions to the debt clause were determined to permit the bond issuance: the exceptions granted for casual deficits and redemption of a previous liability. *See id.* at 5–6, 170 S.E. at 427–28; W.Va. Const. art. X, § 4.

In discussing the debt clause, we observed in *Dickinson* that

> The phraseology employed in the section under consideration [art. X, § 4] indicates that the framers of the Constitution anticipated that emergencies might arise in the state's finances when it would be necessary for indebtedness to be incurred by the state, and therefore provisions were made that such conditions might properly be met if and when they should arise....
>
> ...
>
> We are of the opinion also that legislative justification of the five-million-dollar bond issue is based not only on the existence of casual deficits within the meaning of section 4, Article X of the Constitution, but as well on the existence of "a previous liability of the State" within the meaning of said section. The unanticipated decline in receipts of public revenue produced first the deficits in such revenue *and then, to meet the same, indebtedness was incurred by the state as hereinabove stated.*

114 W.Va. at 6, 170 S.E. at 428 (emphasis supplied).

In upholding the bond issue in *Dickinson*, this Court made clear that application of the "previous liability" exception to the debt clause requires an existing indebtedness and an accompanying liability that results when that specific indebtedness is discharged or satisfied:

> When, by reason of casual deficits in its revenues, the state incurs liability in the discharge of indebtedness incident to such deficits, the same may be funded by state bonds for the issuance of which provision is made by legislative enactment, on the basis of the redemption of "a previous liability of the State" within the meaning of section 4, Article X, West Virginia Constitution.

114 W.Va. at 2, 170 S.E. at 426, syl. pt. 4. More recently, we were again asked to approve a bond issuance under the "previous liability" exception to the debt clause.

In *State ex rel. Department of Employment Security v. Manchin*, 178 W.Va. 509, 361 S.E.2d 474 (1987), we upheld the sale of bonds pursuant to The Debt Fund Act [25]—legislation designed to repay the federal government for moneys borrowed to pay unemployment compensation premiums.[26] In syllabus point one of that decision, we recognized that "*W.Va. Const.*, art. X, § 4, allows the legislature to issue bonds without a constitutional amendment 'to redeem a previous liability of the State.'" Just as in *Dickinson*, this Court found the "previous liability" exception applicable due to preexistent borrowing compelled by bleak economic conditions:

> [T]here is no question that the money borrowed from the federal government pursuant to our qualifying agreement with the Secretary of Labor ... is a valid, existing debt of the State....
>
> Thus, having determined that there is a preexisting liability of the State that in one way or another must be repaid to the federal government, we find no impediment in *W.Va. Const.*, art. X, § 4....

178 W.Va. at 515, 361 S.E.2d at 480.

In *Gribben v. Kirk*, 197 W.Va. 20, 475 S.E.2d 20 (1996), this Court rejected the Legislature's attempt to characterize a judgment against the state for unpaid overtime owed to police officers under certain wage payment statutes as a "moral obligation[ ] of the state." *Id.* at 25, 475 S.E.2d at 25. Based

---

25. W.Va.Code §§ 21A–8A–1 to –14 (1987) (Repl. Vol. 2002).

26. The borrowing was necessitated by the depletion of this state's unemployment security account in the early 1980s due to severe economic recession.

on the fact that this judgment representing unpaid overtime and interest was a "valid legal obligation[ ] of the State," this Court determined that the financial obligation was a "previous liability of the State" under section 4, article X "which must be discharged in a manner consistent with our Constitution." 197 W.Va. at 25, 475 S.E.2d at 25.

There is no dispute that the three funds at issue are currently in actuarially sound condition. While Appellees want us to view the Legislature's obligation to inject increasingly large appropriations into the funds at issue because of the UAAL as the type of enforceable debt that translates into a "previous liability" within the meaning of the debt clause exception, we are not persuaded by this argument. To be required to make appropriations is one thing; to have a valid and enforceable debt against the state is an entirely different matter.

In marked contrast to those three decisions in which this Court has approved extension of this state's credit under the "previous liability" exception, there has been no default in the payment of pensions which would in turn give rise to the creation of an enforceable sum specific indebtedness. The existence of a recognized moral obligation to pay pension benefits—one that is currently being met—does not equate to a "previous liability" of the state within the constitutional meaning of that exception to the debt clause. Provided the Legislature is currently appropriating sufficient funds and continues to responsibly make additional appropriations necessitated by past imprudent financial decisions, there is no "present indebtedness" resulting from the discharge of a specific liability. Moreover, the statutorily required and prudently performed annual calculations of the UAAL relative to the pension systems at issue do not in any manner reflect or represent amounts that are currently owed to anyone. As such, these calculated projections, which can be altered at any time based on different assumptions and market results, similarly cannot come within the constitutional meaning of a "previous liability" of the state.

■ Notwithstanding the Legislature's ostensibly foresightful attempt at reducing anticipated future appropriations required to maintain the fiscal soundness of the funds at issue,[27] the necessary financial prerequisite for extending the state's credit is not demonstrated by the record before us. Because of the current actuarially sound status of the three retirement funds at issue and because there is no "present indebtedness" resulting from the actual discharge of "debt" attributable to such funds, there is no "previous liability" within the meaning of section four of article ten of the state constitution that would permit issuance of the general revenue bonds contemplated by the Act. Absent the applicability of this constitutional exception to incurring debt on the state's behalf or any other exception, the bond sale and investment plan at issue may only be implemented with the consent of the people expressed by the adoption of a constitutional amendment.[28] Accordingly, we hold that the Pension Liability Redemption Act is unconstitutional in that implementation of its provisions would result in violation of the debt clause set forth in section four, article ten of the West Virginia Constitution.

As this Court wisely enunciated in *Dickinson*, "[t]he state's constitutional requirements are for the preservation of the state and the maintenance of its integrity and for the protection of the people." 114 W.Va. at 5, 170 S.E. at 427. Though the specific historical concerns which prompted the inclusion of the debt clause may no longer exist,[29] the objec-

27. We acknowledge Appellants' contention that the risk of losses due to inherent stock market fluctuations is grounds enough for rejecting the funding plan contemplated by the Act. That issue, which essentially questions the wisdom of the Act's provisions, is a policy decision that is for the Legislature and not this Court to determine in the first instance. Under our decision today, however, the people of this state will also be required to pass on the wisdom of such a funding mechanism through a constitutional amendment referendum if the Legislature decides to pursue this funding plan.

28. Appellants note, and Appellees do not dispute, that in those jurisdictions where general obligation pension bonds have issued, such issuance has occurred either by means of voter referendum or pursuant to existing authority.

29. As we discussed in *Bates v. State Bridge Commission*, 109 W.Va. 186, 153 S.E. 305 (1930):

tives for which the debt clause was initially enacted—to curtail the accumulation of mountainous financial obligations that would severely saddle future generations of this state—remain as valid as when the constitution was first adopted. Despite the passage of time, the "pitfalls and dangers attendant upon unrestrained expenditures of public funds to be derived from revenues in the future" of which our constitutional forebears were justifiably determined to prevent are just as deserving of vigilant watchdogging today as in 1872. *State ex rel. State Road Comm'n v. O'Brien,* 140 W.Va. 114, 128, 82 S.E.2d 903, 910 (1954) (Lovins, J., dissenting). *See generally* R. Briffault, *Foreword: The Disfavored Constitution: State Fiscal Limits and State Constitutional Law,* 34 Rutgers L.J. 907, 909, 952 (2003) (noting existence of "enormous gap between the written provisions of state constitutions and actual practice;" recognizing judicial complicity in evasion of constitutional restrictions on debt limitation, and observing that "voter approval requirements are an important theme in contemporary tax and expenditure limitations").[30]

Having determined that the Pension Liability Redemption Act is unconstitutional, the decision of the Circuit Court of Kanawha County is hereby reversed.

Reversed.

When our Constitution of 1872 was formed, the experience of the mother state with debts contracted by her, and with suits to compel payment, were fresh in the minds of the framers of that Constitution. Numerous suits ending in heavy judgments and costs had been prosecuted against the commonwealth; illiberal contracts and guaranties of enterprises had been made by governmental agencies detrimental to her interests; public officers and agencies had not been always zealous and careful in the conduct of public affairs; and

juries leaned toward the individual as against the commonwealth. With this experience, the framers of the Constitution of 1872 provided that this state should not contract indebtedness, except in specified instances. . . . *Id.* at 188–89, 153 S.E. at 306–07.

30. *See* S. Fino, *A Cure Worse than the Disease? Taxation and Finance Provisions in State Constitutions,* 34 Rutgers L.J. 959 (2003).