STATE *ex rel.* BOARD OF GOVERNORS OF WEST VIRGINIA UNIVERSITY, *a corporation*

*v.*

EDGAR B. SIMS, *Auditor of State of West Virginia*

(No. 10177)

Submitted September 7, 1949. Decided October 4, 1949.

LOVINS, JUDGE, not participating.

*Ira J. Partlow,* Attorney General, *W. C. Marland,* Assistant Attorney General, *Mahan, White & Higgins, James H. White,* for petitioner.

*Eston B. Stephenson, Milton S. Koslow,* for defendant.

**FOX, JUDGE:**

This is a proceeding in mandamus in which the relator, Board of Governors of West Virginia University, a corporation, seeks to compel the respondent, Edgar B. Sims, Auditor of the State of West Virginia, to honor a requisition drawn by the State Treasurer on funds appropriated by the Legislature for personal services of officers, teachers and other employees of the State University, and which, if honored, would have authorized the Treasurer of the State of West Virginia to pay retired teachers of the University certain sums of money for the month of April, 1949, under an order of the relator made in the year 1935, and hereinafter dealt with. The appropriation out of which the said sum was to be paid was that provided by the Legislature at its 1947 Session, covering the fiscal years ending June 30, in the years 1948 and 1949.

The powers of the Board of Governors of West Virginia University, hereinafter called the relator, rest on the provisions of Section 1, Article 11, Chapter 18 of the Code, as amended by Chapter 73, Acts of the Legislature, 1947. That section provides that:

> "The West Virginia University, heretofore established and located at Morgantown, in Monongalia County, shall be continued, and shall be known as 'West Virginia University.' The business and educational affairs of the university shall be under the control, supervision and management of the board of governors, which shall be a corporation, and as such may contract and be contracted with, sue and be sued, plead and be impleaded, and have and use a common seal."

Then follows this provision which appears in the 1947 amendment to the Act:

> "The board of governors shall have general control, supervision and management of the business and educational affairs of the university and of Potomac state school, and shall have full authority to employ all officers, teachers and other employees of such institutions and fix their yearly or monthly salaries."

In the year 1935, the Board of Governors instituted a formal program for the payment of retirement benefits to the teaching personnel of the University, who had passed or would pass the age of sixty-five years, and an order was entered instituting such program, designated as Order No. 218, and reading as follows:

"ORDERED, That effective September 1, 1935, and each twelve months' period thereafter, each professional staff member of the West Virginia University who shall then be or shall reach the age of sixty-five during the fiscal year immediately preceding, shall automatically be transferred to limited service status with an annual stipend of $1200.00 to $1800.00. The Board of Governors, upon recommendation of the proper professional and administrative officers, which recommendations shall be based upon marked promise of continued, outstanding professional service, may invite individual staff members to remain in full service, for a definite period at a time and at a determined rate of compensation."

It appears from the record before us that, following this order, such a retirement program was inaugurated and continued by the relator.

The Legislature of 1941, by Chapter 36 of that session, enacted a teachers retirement system, covering all teachers of the State, including those of the University, which now appears in Michie's Code, 1943, as Article 7A, Chapter 18. Following that enactment, it appears that relator made some change in its retirement program, and, subsequent to the effective date of said general teachers retirement act, the amount paid to retired teachers of the University was reduced, and payments thereafter made was the difference between the amount they would receive under the general teachers retirement system, and that which had been theretofore paid to them out of funds appropriated for the University, in accordance with the policy adopted by Order No. 218, aforesaid. That order seemed to contemplate that, to obtain retirement payments, it would be necessary for retired teachers to per-

form some work under a limited service status, but in the petition filed by relator herein, it is specifically stated that teachers receiving pay under the University retirement program have not, and are not expected to perform any work or service for the University.

The retirement payments were made out of University funds from time to time, with the approval of the Auditor, respondent herein, until the month of April, 1949; but when a requisition was presented to him covering such payments, accruing within that month, he refused to honor the same, with the result that this proceeding was instituted. On June 17, 1949, we awarded the rule herein. The case now comes on to be heard upon relator's petition and the demurrer of respondent thereto.

Relator's petition filed herein on June 16, 1949, sets up the facts stated above, and alleges that the general powers granted to the Board of Governors cover the right to provide the retirement fund for University teachers as exercised by Order No. 218 quoted above. Also, that relator had "inherent authority to enter such an order as was entered in 1935, by virtue of the authority vested in it by the Legislature of West Virginia, as expressed in Chapter 18, Article 11, Section 1, Michie's Revised Code, 1931." Also, that Section 2 of Chapter 36, Acts of the Legislature, 1941, setting up the teachers retirement system, and which reads:

> "Nothing in this article shall be construed to preclude any employer from providing retirement benefits to retired teachers not eligible to benefits under this article; nor shall it be construed to preclude any employer from supplementing retirement benefits to be received by any of its employees under this article.
> "No such benefits, however, shall be paid to a present teacher who elects not to become a member of the teachers' retirement system.",

amounts to a recognition of the authority of relator to make the payments authorized under the Order No. 218 aforesaid. The petition also avers the power of the Legis-

lature to authorize the use of public funds to provide retirement pay to teachers; and avers that the making of such payments will not in any wise violate the provisions of the Constitution of this State.

The respondent files his demurrer to the said petition assigning seventeen separate grounds therefor. It seems unnecessary to go into great detail in respect to these grounds. The demurrer avers that the Board of Governors could not legislate a retirement pension plan; that the University retirement program is unauthorized by law and is made without express authority of law, and prohibited by Section 38 of Article VI of the Constitution of West Virginia; that the recipients of such fund, under such program, are without legal standing under the theory of a moral obligation; that an appropriation for personal services amounting to $2,150,000.00, made for the fiscal years 1947-48 and 1948-49, by the 1947 Session of the Legislature showed no legislative intent that such funds might be used for payments to retired personnel of the University who performed no additional services; that it was unlawful for the Board of Governors to incur any liability during any fiscal year which could be paid out of the then current appropriation for such year; that the Legislature could not authorize the payment of any claim upon an agreement or contract made without express authority of law; that such authorization would amount to the contracting of a debt in violation of Section 4, Article X of the State Constitution; that such payment would constitute a gift or gratuity of the State within the prohibition of Section 6, Article X of the Constitution; that such payment is prohibited by Section 38, Article VI of the State Constitution, hereinafter quoted; that no provision of law exists which authorizes supplemental payments in addition to payments under the general teachers retirement fund aforesaid; that custom does not justify violation of statutory and constitutional provisions; and finally, a reliance upon the statute of frauds, Code, 55-1-1, which provides that no action shall be brought on any

agreement not to be performed within a year unless such agreement be in writing.

Inasmuch as many of the questions raised in this proceeding depend on the construction of Section 38, Article VI of the Constitution of this State, said section is here quoted. The pertinent provisions are that:

"No extra compensation shall be granted or allowed to any public officer, agent, servant or contractor, after the services shall have been rendered or the contract made; nor shall any Legislature authorize the payment of any claim or part thereof, hereafter created against the State, under any agreement or contract made, without express authority of law; and all such unauthorized agreements shall be null and void. * * *"

Section 4 of Article X of the Constitution provides that:

"No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; * * *."

In the able brief filed by counsel for relator, the power of the Legislature to set up a retirement system for employees of the State, or any subdivision thereof, including teachers, is stressed; and it is earnestly contended that nothing in Section 38 of Article VI of our Constitution prohibits the Legislature from enacting legislation to effect such purpose. We fully agree with this contention. We do not believe that such legislation involves the creation of a debt inhibited by Section 4 of Article X of the Constitution; nor that it is in contravention of the provisions of Section 38 of Article VI of our Constitution which provides that no extra compensation shall be allowed to any public officer, agent, servant or contractor, after the services shall have been rendered or the contract made. While custom does not create power, it does furnish the basis for legislative action, where such action is not prohibited by the Constitution. The section last referred to above does not inhibit the Legislature from enacting such legislation; and the Legislature, under the broad

powers vested in it under the general theory of legislative power, is permitted to enact such legislation, where the payments authorized can be said to be for a public purpose as distinguished from a personal gratuity. It is well settled in this State that the Legislature may appropriate money for public purpose but for no other purpose. *Woodall* v. *Darst,* 71 W. Va. 350, 77 S. E. 264, 80 S. E. 367. Retirement systems, for public employees, including teachers, are coming to be recognized as needful and as based upon sound public policy, and they have been adopted not only by the State, but by many subdivisions thereof. For example, the employees of the Department of Public Safety are retired at the age of fifty-five, and retirement pay is provided for them; we have our state wide and all inclusive teachers retirement system; in many of the municipalities of the State, provision is made for retirement pay for policemen and firemen, and perhaps other employees; and many other like instances could be cited. Provisions for retirement pay may be said to be almost universally practiced throughout this country, both in public and private affairs. Therefore, we do not question the power of the Legislature to provide for the payment of retirement benefits to public employees, in all cases where it may reasonably be said to be for a public purpose; and certainly payment of retirement benefits to teachers of all classes may be said to be for a public purpose. We do not enlarge upon the arguments which sustain such legislation. What we have said on this point of the case is to make certain that this opinion will not be interpreted as casting any doubt upon the power of the Legislature to provide for retirement payments such as that which the relator here seeks to have enforced.

As we view this case, the solution of the question here raised depends on whether the Legislature has conferred upon the Board of Governors of the West Virginia University, either by direct terms, or through necessary implication, the power to provide for supplemental payments to teachers, as is proposed to be done under the provisions of Order No. 218, quoted above. We have quoted the pro-

visions of Section 1, Article II, Chapter 18 of the Code, as amended, and we can not interpret the powers there **granted to extend to making provisions for the payment** of retirement funds to teachers employed in our State University. It may be conceded that where the Legislature grants definite power to one of its creatures, such as the Board of Governors, there goes with the powers granted, by necessary implication, such reasonable powers as are necessary to make them effective. This principle runs through the interpretation of all statutes, and, of course, applies in this case. But, where is the language that can, by any reasonable construction, be held to mean that the Legislature intended to authorize the Board of Governors of the University to expend public money on a program never presented to or considered by the Legislature, in the face of a constitutional provision which, as a restraint on the Legislature, provides that:

> "Nor shall any Legislature authorize the payment of any claim or part thereof, hereafter created against the State, under any agreement or contract made, without express authority of law; and all such unauthorized agreements shall be null and void."

If the Legislature has not exercised its power to authorize such payment, how can it be argued that its creature can do so? The language of the Constitution refers to payments under agreements, and, as construed by the relator, Order No. 218, when acted upon and accepted by teachers, constituted, in effect, an agreement between the University authorities and its teachers.

But the constitutional provision, aforesaid, covers a broader principle, and that is that even the Legislature may not authorize the expenditure of public funds for purposes not authorized by law. Granting that the Legislature possessed and now possesses the power to authorize the payments which the relator seeks to make, we do not think it has done so; and, therefore, we are unwilling to compel an official of the State to authorize an expenditure of public funds for which there is no authority in law.

The contention, though not pressed in argument, that the Board of Governors possesses the inherent power, presumably because of custom and supposed necessity, to make provision for the payment of retirement pay to retired teachers can not be sustained. Inherent power is defined as "An authority possessed without its being derived from another. A right, ability or faculty of doing a thing, without receiving that right, ability or faculty from another." Black's Law Dictionary, 963. We do not think there can be such a thing as an inherent power in a State agency, created under the legislative power of the State, and where its power rests solely on legislative grant by which there has been delegated to it specific powers. There is inherent power vested in the three divisions of our government, Executive, Judicial and Legislative; but to extend that power to boards and commissions which owe their very existence and authority to the Legislature, the authority and power of which is limited by the legislative act creating it, would too far expand their power, and would not be in accord with the sound policy which should be followed in respect thereto. Sound public policy suggests that the powers of subordinate agencies should be limited to those expressly granted by the Legislature, and those necessarily implied, rather than, by judicial construction, or otherwise, expanded to embrace powers never intended to be granted.

Nor can we bring ourselves to believe that the provisions of Section 2 of Chapter 36, Acts of the Legislature, 1941, setting up the State Teachers Retirement System can be construed as granting to the Board of Governors of West Virginia University any power which it did not otherwise possess. It may be that the Legislature had knowledge of the practices then in existence, on the part of the Board of Governors of the University, but that is mere conjecture, and the power to expend public money should never rest upon conjecture. There was a direct way to authorize the expenditure, by the Board of Governors, of public funds for the purpose of making payments to retired teachers of the University. If such a

system is desirable, it should rest upon direct legislation, and not upon a strained construction of the statute, on supposed implication or conjecture as to the legislative purpose.

Some aspects of the question now before us were considered in *State ex rel. W. B. Tucker* v. *The City of Wheeling*, 128 W. Va. 47, 35 S. E. (2d) 681. That was a case where it was proposed by the City of Wheeling to enforce an ordinance providing for the payment of retirement benefits to employees of the City of Wheeling, other than firemen and policemen, there already being enforced provisions for the retirement and payment of pensions to firemen and policemen of that city. Admittedly, there was no provision in the charter of the City of Wheeling which authorized the payment of retirement benefits to retired city employees, other than firemen and policemen; and the city had not adopted the provisions of the statute enacted under the provisions of the Home Rule Amendment of the Constitution of the State under which, as we understood, such retirement payments could be made. We there held:

"The Council of The City of Wheeling is not authorized by its special charter, Chapter 141, Acts of the Legislature, 1935, either in express terms or by necessary implication, or by general statutes, to create a fund for the pension and retirement of employees of the city other than firemen and policemen."

In a general discussion of the question at issue in that case, and after discussing the local application, we said

"Unless backed by impelling reasons, it is an unsafe theory of government to authorize the expenditure of public moneys through mere implication. Some municipalities in the State, with proper concern for the public interest and welfare of employees, have from time to time asked the Legislature for authority to establish policemen and firemen pension and retirement funds. This they could as well have done with respect to other classes of employees, but they have not done so; and until they secure such general legis-

lative authority, either by direct legislative enact-
ment, or by adoption of the home rule for mu-
nicipalities statute, in the manner provided by
law, they cannot create such funds. The City of
Wheeling, operating under a special charter, and
not operating under the statute enacted under the
home rule amendment does not, in our opinion,
now possess the power to create such a fund, or
to expend public moneys therefor."

As stated in that case, the City of Wheeling could have
secured authority from the Legislature, and, perhaps, by
adoption of statutes enacted under the Home Rule Amend-
ment, would have had the power to provide retirement
payments for retired employees of all classes; but it had
not done so. By analogy to that situation, we may say
that the Board of Governors of West Virginia University
might have been able to secure from the Legislature pow-
er to provide a fund for the payment of benefits to retired
teachers of that institution, in addition to those to which
they were entitled under the general retirement system
applicable to all teachers; but it has not done so. The only
claim for the power now asserted in this proceeding is
based upon a supposed implication of power growing out
of the general authority of the board, the inherent author-
ity of the board, and the supposed recognition accorded
the system now contended for, by the 1941 Acts of the
Legislature. There is no contention that the Legislature
has by any direct method authorized the Board of Gov-
ernors to provide for such expenditures.

As bearing upon the probable purpose and intent of the
Legislature in enacting the statute here involved, this
Court, in the interpretation of such statute, is justified in
taking into account the application of that interpretation
to other statutes of a kindred nature. With this thought in
mind, we call attention to the statute defining the powers
of the State Board of Control, Code, 25-1-3, wherein it is
provided that:

"The state board of control shall manage, di-
rect, control and govern the West Virginia chil-
dren's home, West Virginia colored children's

home, West Virginia home for aged and infirm colored men and women, Hopemont sanitarium, Rutherford sanitarium, Denmar sanitarium, Berkeley Springs sanitarium, Welch emergency hospital, McKendree emergency hospital, Fairmont emergency hospital, Huntington state hospital, Spencer state hospital, Weston state hospital, Lakin state hospital, West Virginia training school, West Virginia industrial school for boys, West Virginia industrial school for colored boys, West Virginia industrial home for girls, West Virginia industrial home for colored girls, West Virginia penitentiary, and such other state institutions, other than educational, as now are or may hereafter be created by law."

By Code, 18-2-5, the general powers and duties of the State Board of Education are defined in the language following:

"Subject to and in conformity with the Constitution and laws of this State, the state board of education shall determine the educational policies of the State, except as to the West Virginia university, and shall make rules for carrying into effect the laws and policies of the state relating to education, including rules relating to the physical welfare of pupils, the education of feeble-minded and physically disabled or crippled children of school age, retirement fund for teachers, school attendance, evening and continuation or part-time day schools, school extension work, the classification of schools, the issuing of certificates upon credentials, the purchase, distribution and care of free textbooks by the district boards of education, the general powers and duties of county and district boards of education, and of school trustees, teachers, principals, supervisors, and superintendents, and such other matters pertaining to the pubic schools in the State as may seem to the board to be necessary and expedient."

By Chapter 88, Acts of the Legislature, 1947, it is provided:

"The state board shall have general control, supervision and management of the business and educational affairs of Marshall college, Fairmont

state college, West Liberty state college, Glenville state college, West Virginia institute of technology, Shepherd college, Concord college, West Virginia state college, Bluefield state college, the West Virginia schools for the deaf and the blind, and the West Virginia school for the colored deaf and blind. The state board shall employ the president or principal, and the professors, teachers and other employees of each of the state educational institutions under its control and management, and shall fix the yearly or monthly salary to be paid to each person so employed.

"The control of the financial, business and all other affairs of the state educational institutions named in the preceding section is hereby transferred from the state board of control to the state board of education. The state board of education shall, in respect to the control, management and property of such institutions, have the same rights and powers and shall perform the same duties as were heretofore exercised or performed by the state board of control. The title to all property of such institutions is hereby transferred to and vested in the state board of education."

The powers granted by the Legislature to the State Board of Control, and to the State Board of Education, are fully as broad as are the powers granted by the Legislature to the Board of Governors, hereinbefore discussed. Like powers are granted to the heads of many other departments of the State government, as to duties and functions pertaining to their office; but we mention the statutes above quoted as furnishing the best example of how a decision in favor of the powers contended for by the relator might be applied to the exercise of the powers of other boards and commissions. We do not think it will be contended that the Legislature intended that the Board of Control or the State Board of Education should set up retirement funds for employees or teachers, outside those authorized by existing law; and yet, in our opinion, if the Board of Governors of the University are held to possess such powers, we could not, with any consistency, deny the same powers to the Board of Control and the State Board of Education, and, perhaps, other boards, officials

and commissions. We think we would be treading upon dangerous ground if we should, on some theory of implied powers, authorize the expenditures of public funds by any of these boards in setting up and administering retirement funds for their employees.

The profession of teaching is a high and honorable vocation, but teachers in our University cannot, through any theory of implication, be singled out as entitled to favors which, under the law, cannot be granted to worthy employees of the State Board of Control, who handle our humane and penal institutions, or teachers in our schools of higher learning, other than the University, which are placed within the control of the State Board of Education.

Being of the opinion that the Board of Governors of West Virginia University, as constituted in 1935, was without power to adopt Order No. 218, or to expend public money on the basis thereof; or that the board as now constituted possesses power to expend public money based on said order; and, further, that any expenditure of public funds thereunder is without authority of law; and that the Auditor of West Virginia was without authority of law to honor the requisition made upon him, to effect such expenditures, the writ of mandamus prayed for will be denied.

*Writ denied.*