446 S.E.2d 921

Darrell V. McGRAW, Jr., in his official capacity as Atty. Gen. of West Virginia, Appellant,

v.

The Honorable Gaston CAPERTON, in his official capacity as Governor of the State of West Virginia; Ron Riley, in his official capacity as Director of the Purchasing Division, Department of Administration of the State of West Virginia; and Chuck Polan, in his official capacity as Secretary of the Department of Administration of the State of West Virginia, Appellees,

Dr. Henry Marockie, State Superintendent of Schools; and the West Virginia Department of Education, Intervenors Below, Appellees.

No. 22011.

Supreme Court of Appeals of West Virginia.

Submitted March 1, 1994.

Rehearing Denied July 6, 1994.

Decided July 21, 1994.

530

Frances A. Hughes, Managing Deputy Atty. Gen., and Katherine A. Schultz, Sr. Deputy Atty. Gen. and Katherine L. Dooley, Asst. Atty. Gen., Charleston, for appellant.

Diana Stout, Sp. Asst. Atty. Gen., and Daniel R. Schuda, Jan L. Fox, Steptoe & Johnson, Charleston, for appellees, Caperton, Riley and Polan.

Victor A. Barone, Charleston, for appellee, Marockie.

**BROTHERTON, Chief Justice:**

On July 25, 1993, the Attorney General filed a declaratory judgment action against Governor Gaston Caperton, Ron Riley, the Director of the Purchasing Division of the Department of Administration, and Chuck Polan, the Secretary of the Department of Administration, the appellees in this case, and Henry Marockie, State Superintendent of Schools, and the West Virginia Department of Education, as intervenors, pursuant to W.Va.Code § 55–13–1 *et seq.* (1993). The Attorney General requests a determination of his rights and responsibilities under W.Va. Code § 5A–3–13, which requires that he approve State contracts "as to form." He also asks for a ruling as to the constitutionality and validity of the two computer hardware and software contracts which are the basis for the Governor's Basic Skills Computer Education Program.

On November 10, 1993, the Circuit Court of Kanawha County granted the appellee's motion and dismissed the Attorney General's declaratory judgment action. The court found that:

> [t]he attorney general in his official capacity is not empowered under the West Virginia Constitution and the statutes of this State to institute a declaratory judgment action as a plaintiff. Further, the Attorney General may not maintain an action against agencies and individuals for whom he is statutory counsel such as the named defendant herein. *Manchin v. Browning,* 170 W.Va. 779, 296 S.E.2d 209 [909] (1982).

The Attorney General brings this appeal from that final order.

The contracts which form the basis of the Attorney General's declaratory judgment action are part of the Governor's Basic Skills Computer Education Program. On June 6, 1989, the Governor sent a letter to various vendors, inviting them to submit bids for the program and advising them that the State would invest $70 million over the next ten years in the program. West Virginia Code § 18–2E–7 (1989) requires the State Board of Education to develop a plan which specifies the resources to be used to provide a basic skills computer program, including specifications for the computer hardware and software. The Attorney General alleges that when the State Board of Education issued its Request For Proposal (RFP), the RFP did not include any hardware or software specifications.

During the first phase of RFP evaluation, multiple proposals were considered and the pool of qualified, responsible bidders was narrowed to three—Jostens, Tandy Corporation, and IBM. At the conclusion of the second evaluation phase, the scores of the three proposals were Jostens first, IBM second, and Tandy third. However, IBM was awarded the contract because, among other reasons, IBM agreed to provide West Virginia with approximately $2 million worth of free public relations regarding the Basic Skills Computer Education Program. Part of the contract was also issued to Jostens.

On June 25, 1990, Master Contract No. 01A was issued to Jostens, and Master Contract No. 01B was issued to IBM, for a term of one year, with the State given the option to renew the contract in one-year increments for nine additional years. The contracts were characterized as "Open–End Contracts," in which "the State shall not be obligated to procure any minimum orders for hardware, software and services throughout the term of this agreement." Both contracts provide that if funds are not appropriated, the agreement would terminate on June 30 and the contract would become null and void and of no effect. Such purchase orders were renewed twice for terms through June 30, 1993, without additional bidding or evaluation. The renewals were achieved through the issuance of change orders to both contracts. The Attorney General contends that the contracts are unconstitutional and that the renewals should have been competitively bid.

Before the constitutionality issue is addressed, however, the ability of the Attorney

General to bring a declaratory judgment action must be determined. In *Manchin v. Browning*, 170 W.Va. 779, 296 S.E.2d 909 (1982), this Court defined the power of the Attorney General: "The powers and duties of the Attorney General are specified by the constitution and by rules of law prescribed pursuant thereto." *Id.* at syl. pt. 1. Therefore, we look to the West Virginia Code to determine what right the Attorney General has to file a declaratory judgment action.

■ The Attorney General claims the right to file this declaratory judgment action under West Virginia Code § 55–13–2 (1993), which provides that:

Any person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract or franchise and obtain a declaration of rights, status or other legal relations thereunder.

An analysis of this statute and W.Va.Code § 55–13–11 make it clear that the Attorney General is not considered to be a "person interested" within the meaning of W.Va.Code § 55–13–2. The term "person" is defined in W.Va.Code § 55–13–13: "The word 'person,' wherever used in this article, shall be construed to mean any person, partnership, joint-stock company, unincorporated association, or society, or municipal or other corporation of any character whatsoever." There is nothing in this Code section which would include the Attorney General in the category of those considered "persons" for the purpose of maintaining a declaratory judgment action. In fact, W.Va.Code § 55–13–11 specifically excludes the Attorney General from those considered to be a party.

When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding. In any proceeding which involves the validity of a municipal ordinance or franchise, such municipality shall be made a party, and shall be entitled to be heard, and if the statute ... is alleged to be unconstitutional, the attorney general of the state shall also be served with a copy of the proceeding and be entitled to be heard.

Even when the statute or ordinance in question is alleged to be unconstitutional, the Attorney General is not considered a party—as the state's chief legal officer, he is merely served with a "copy of the proceeding" and given the opportunity to be heard on behalf of the state. An opportunity to be heard is a world apart from being considered a "person interested" for purposes of this article. Since the Attorney General does not come within the parameters of the definition of "person," he has no right to bring a declaratory judgment action in his official capacity.

As support for the argument that he is authorized to bring a declaratory judgment action, the Attorney General cites *Arthur v. County Court of Cabell County*, 153 W.Va. 60, 167 S.E.2d 558 (1969), in which this Court stated that:

A declaratory judgment action is a proper procedure for an adjudication of legal rights and duties of parties to an actual, existing controversy which involves the construction or application of a statute or of statutes.

*Id.* at syl. pt. 1. In *Arthur*, the Cabell County Court Clerk, a county official, filed an action for declaratory judgment against the county and against individual commissioners in order to have a judicial determination of whether he was entitled to receive from the county court reasonable compensation in addition to his official salary for services rendered in preparation of the annual financial statement for Cabell County. In holding that the clerk was not entitled to additional compensation, the Court stated that for a controversy to be justiciable, the case must present an "actual and existing controversy of such a character as to be justiciable...."

*Id.,* 167 S.E.2d at 559. *See also Farley v. Graney,* 146 W.Va. 22, 119 S.E.2d 833 (1960).

The Attorney General's reliance on *Arthur* is misguided. There is nothing in *Arthur* which holds that a state, county, or municipal official could properly file a declaratory judgment action while acting within his official duties. That simply was not the issue. In *Arthur,* the plaintiff was personally interested in the declaratory judgment action since he hoped to obtain compensation for services rendered in addition to his official duties. In the case now before us, there is no reason to believe that the Attorney General was acting in anything other than his official capacity. Consequently, we hold that the Attorney General, acting in his official capacity, does not come within the parameters of the definition of "person" set forth in W.Va.Code § 55–13–13 and is not entitled to bring a declaratory judgment action pursuant to W.Va.Code § 55–13–2.

 The finding that the Attorney General is not entitled to bring a declaratory judgment action is consistent with our recent holding in *State ex rel. Fahlgren Martin, Inc. v. McGraw,* 190 W.Va. 306, 438 S.E.2d 338 (1993). In *Fahlgren Martin,* we held that:

The West Virginia Constitution and W.Va.Code § 5A–3–13 (1993) grant the Attorney General the duty to approve a contract as to form only. If a contract is legal, then he is required by statute to approve the contract as to form, regardless of any perceived wrongful acts. The Attorney General can list perceived illegalities, in writing, for the Purchasing Division and the Prosecuting Attorney to deal with once the contract is returned to Purchasing's office. The Attorney General cannot hold a contract in his office awaiting the outcome of a trial, investigation, or other proceedings. The Attorney General has no investigative powers in connection with the contract. He cannot sue on the con-

tract on behalf of the State unless otherwise authorized by statute.

*Id.* at syl. pt. 3. Because the Attorney General cannot sue on a contract unless otherwise authorized by statute, and since we have held today that the Attorney General is not considered to be a "person interested" within the purview of W.Va.Code § 55–13–2, the Attorney General has no authority to bring a declaratory judgment action.[1]

 Although this ruling makes this case technically moot, the underlying issues before us today will still be addressed in this opinion. In *Israel v. West Virginia Secondary Schools Activities Commission,* 182 W.Va. 454, 388 S.E.2d 480 (1989), we held that there were several factors to be considered in determining whether to decide issues in a case that was otherwise moot:

Three factors to be considered in deciding whether to address technically moot issues are as follows: first, the Court will determine whether sufficient collateral consequences will result from determination of the questions presented so as to justify relief; second, while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of the bar and of the public; and third, issues which may be repeatedly presented to the trial court, yet escape review at the appellate level because of their fleeting and determinate nature, may appropriately be decided.

*Id.* at syl. pt. 1.

In the case now before us, there are more than just "sufficient collateral consequences" which would justify determining these issues now. Even if this case is dismissed, a separate suit with basically the same issues currently exists in Kanawha County Circuit Court. If no determination is made now, in this opinion, regarding the issue of whether the computer contract is constitutional, it could be another year or more before the additional computers are actually installed

---

1. This case does not limit the Attorney General's ability to act in situations otherwise authorized by statute.

and training can be continued. Secondly, the issue of whether the computer contract is constitutional is of great public interest, given that the public's tax dollars are paying for the multi-million dollar computer contract. Last, in the interest of judicial economy, the other issues which remain in this case will be addressed now so as to avoid having to wait until the second case in Kanawha County Circuit Court wends its way to us.

■ The constitutional issue raised before this Court is whether the IBM and Jostens one year contracts with nine options to renew are constitutional. The Attorney General argues that the contracts are, in essence, ten year contracts which violate Article X, § 4 of the West Virginia Constitution, which provides that "[n]o debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years,"[2] and W.Va.Code § 12–3–17 (1993), which holds that:

> [i]t shall be unlawful for any state board, commission, officer or employee: (1) To incur any liability during any fiscal year which cannot be paid out of the then current appropriation for such year or out of funds received from any emergency appropriation; or (2) to authorize or to pay any account or bill incurred during any fiscal

year out of the appropriation for the following year....[3]

Like any constitutional provision, however, it must be interpreted in light of today's world and current innovations in technology.

■ In the past, this Court has interpreted Article X, §§ 4 and 8 of the West Virginia Constitution in light of legislative enactments which create programs for today's world. For example, this Court has held that, ordinarily, the creation of a state board or commission which requires an annual appropriation of public funds to function is not considered to be the creation of a public debt, even though it requires an indefinite number of future yearly appropriations. *State ex rel. Dyer v. Sims*, 134 W.Va. 278, 58 S.E.2d 766, 773 (1950), *overruled on other grounds*, 341 U.S. 22, 71 S.Ct. 557, 95 L.Ed. 713 (1951). Similarly, the type of debt created when the State employees' retirement system was formed was not considered the type prohibited by statute or the Constitution. *State ex rel. Board of Governors of West Virginia University v. Sims*, 133 W.Va. 239, 55 S.E.2d 505, 508 (1949). Further, the statute and Constitution are not violated when a long-term contract is for the purchase of necessary services.[4]

> Long-term contracts for the purchase of necessary services, such as electricity and water, have long been held not to violate constitutional and statutory provisions prohibiting municipal corporations from incurring indebtedness, when the agreements

payments are made within the same fiscal year as the appropriations.

---

2. In *State ex rel. State Building Commission v. Moore*, 155 W.Va. 212, 184 S.E.2d 94 (1971), the Court explained that this provision was intended to prohibit the creation of debts by the State which would be repaid by public tax.

3. We note that in this case, the purchase orders complained of by the Attorney General show a payment schedule with three dates, July 1, 1993, January 1, 1994, and July 1, 1994. If made as scheduled, the payments would be within one actual year, but outside the fiscal year as contemplated by statute, since the fiscal year ends on June 30. Although technically outside the one fiscal year requirement, we do not hold that the whole contract violates the statute, as the intent was clearly that it be paid within one year. However, the renewals should be awarded so

4. In *State ex rel. West Virginia Resource Recovery-Solid Waste Disposal v. Gill*, 174 W.Va. 109, 323 S.E.2d 590 (1984), *overruled on other grounds*, *Winkler v. State School Building Authority*, 189 W.Va. 748, 434 S.E.2d 420 (1993), the Court held that the purpose of the statutory provisions limiting the future indebtedness of the State was "to protect the fiscal integrity of the State by prohibiting creation of any present indebtedness that would obligate subsequent legislatures to make appropriations. *Id.*, 323 S.E.2d at 592–93. *See also Brewer v. City of Point Pleasant*, 114 W.Va. 572, 172 S.E. 717 (1934).

specify that periodic installments will be paid as the service is furnished. Those contracts do not create a present indebtedness for the aggregate of all installments for the term of the contracts contrary to the municipal debt limitation provisions of Article X, Section 8 of the Constitution and W.Va.Code, 11–8–26, but are obligations that mature periodically as each installment comes due.

*State ex rel. West Virginia Resource Recovery–Solid Waste Disposal v. Gill,* 174 W.Va. 109, 323 S.E.2d 590, 595 (1984), *overruled on other grounds, Winkler v. State School Building Authority,* 189 W.Va. 748, 434 S.E.2d 420 (1993).

The language used in *Dyer, Sims,* and *Gill* leads us to conclude that although technically, the legislature was prohibited from forcing future legislatures to appropriate funds to cover these particular items, the debts were not prohibited if the services were deemed necessary. For example, in *Sims,* the Court explained its decision not to prohibit the creation of a State employee retirement system by noting:

> It is well settled in this State that the Legislature may appropriate money for public purpose but for no other purpose ... Retirement systems, for public employees, including teachers, are coming to be recognized as needful and as based upon sound public policy, and they have been adopted not only by the State, but by many subdivisions thereof ... Therefore, we do not question the power of the Legis-

lature to provide for the payment of retirement benefits to public employees, in all cases where it may reasonably be said to be for a public purpose; and certainly payment of retirement benefits to teachers of all classes may be said to be for a public purpose.

*Id.,* 55 S.E.2d at 508.

■ Strong policy considerations exist in education, as well. Article XII, Section 1 of the West Virginia Constitution provides that "[t]he legislature shall provide, by general law, for a thorough and efficient system of free schools." This provision gives a constitutionally preferred status to public education. Syl. pt. 2, *State ex rel. Board of Education of Kanawha County v. Rockefeller,* 167 W.Va. 72, 281 S.E.2d 131 (1981). In furtherance of that constitutional mandate, the legislature created W.Va.Code § 18–2E–1 *et seq.* (1993), in which the legislature expressed its purpose of establishing a high quality of educational standards. The computer program at issue in this opinion is an extension of the legislature's professed commitment to high quality education. In *Pauley v. Kelly,* 162 W.Va. 672, 255 S.E.2d 859 (1979), this Court held that "[t]he mandatory requirement of 'a thorough and efficient system of free schools' found in Article XII, Section 1 of the West Virginia Constitution, makes education a fundamental, constitutional right in this State." *Id.* at syl. pt. 3.

■ West Virginia Code § 18–2E–7[5] provides the framework for the computer

---

5. West Virginia Code § 18–2E–7 states:

The Legislature finds that teachers must be provided the support, assistance and teaching tools necessary *to meet individual student in*structional needs on a daily basis in a classroom of students who differ in learning styles, learning rates and in motivation to learn. The Legislature further finds that attaining a solid foundation in the basic skills of reading, composition and arithmetic is essential for advancement in higher education, occupational and avocational pursuits and that computers are an effective tool for the teacher in corrective, remedial and enrichment activities. Therefore, the state board shall develop a plan which specifies the resources to be used to provide services to students in the earliest

grade level and moving upward as resources become available based on a plan developed by each individual school team.

This plan must provide for standardization of computer hardware and software for the purposes of achieving economies of scale, facilitating teacher training, permitting the comparison of achievement of students in schools and counties utilizing the hardware and software, and facilitating *the repair of equipment,* and ensuring appropriate utilization of the hardware and software purchased for remediation and basic skills development.

The state board shall determine the computer hardware and software specifications after input from practicing teachers at the appropriate grade levels and with the assistance of

system, finding that the computer is an "effective tool for the teacher in corrective, remedial and enrichment activities." The statute then requires the State board to "determine the computer hardware and software specifications after input from practicing teachers at the appropriate grade level and with the assistance of educational computer experts and the curriculum technology resource center." Although the Attorney General argues that the Board of Education failed to fulfill its duty to create the specifications themselves, we believe the requirements of statute were satisfied. The Board conducted a thorough review of the bids and, along with the Purchasing Department, adopted the specifications found in the winning bid. There has been no complaint by the teachers about the lack of teacher input, nor any complaint of unfair bidding procedures by the five final bidders. Despite the fact that the computer software companies may have put together the lists of what they, the experts, believed were needed, surely the Board chose only that which it believed to be applicable and necessary in West Virginia, and requested replacements for unusable items. Ultimately, the Board did determine the computer hardware and software as required by statute. The Attorney General's argument to the contrary merely splits hairs.[6]

■ After a careful review of the Constitution, statutes, and case law, we conclude that the one year contracts with multiple

renewals and non-binding cancellation clauses at issue in this case do not create the type of debt prohibited in Article X, § 4 of the West Virginia Constitution or W.Va.Code § 12–3–17. First, like the creation of the State employees' retirement system in *Sims*, and State boards and commissions in *Dyer*, this computer package is a "needful thing" and has a strong public purpose—the education of the State's children in a science that will better enable them to compete for employment in the years to come. Further, like our holding in *Gill*, this contract does not create a present indebtedness for the aggregate of all the installments. Instead, the contract provides for periodic installments to be paid as the services are furnished. Next, we point out that the contract can be cancelled at any point in the remaining years left in the installments. Not only can it be cancelled, but it need not be renewed at the end of each installment period by simply refusing to appropriate additional funds and all equipment, training, and maintenance become the property of the State. If the contract can be cancelled by future legislatures, with the State no worse for the cancellation, then the concern over future legislatures being burdened by the current legislature's appropriations is non-existent.[7] In addition, the legislature reappropriates all unexpended balances from the previous year. Finally, we have to include a practical note. In today's age of high technology, long-term contracts are the primary method of achieving the most efficient and consistent services. To

---

educational computer experts and the curriculum technology resource center.

Computer hardware and software shall be purchased either directly or through a lease purchase arrangement pursuant to the provisions of article three [§ 5A–3–1 et seq.], chapter five-a of this code in the amount equal to anticipated revenues being appropriated.

The state board shall develop and provide through the state curriculum technology resource center a program to ensure adequate teacher training, continuous teacher support and updates.

6. In response to the Attorney General's contention that the counties paid extra for software that should have been included, we believe that should be taken up with the vendor to determine if an error was made.

7. We also note a very practical distinction between this situation and that found in *Winkler v. State School Building Authority*, 189 W.Va. 748, 434 S.E.2d 420 (1993). In the *School Building Authority* case, the investors were sold bonds up front, before any building had occurred. If there was a default on the bonds, then the holders could conceivably foreclose on the school buildings in payment on that debt. In this case, equipment has been paid for as it has been installed. Since the school board has been paying as they go, there is nothing to be repossessed and there is no money owed and, therefore, no debt that must be addressed by a subsequent legislature.

hold to the contrary would be to ignore the practical necessity of keeping up to date with modern technology. This does not mean that the Constitution and the statutes can be ignored. Rather, the contracts must be tailored to meet legal requirements, as has been done in this case.

■ Because we have held that contracts with yearly installments and a non-binding cancellation clause are within constitutional parameters, we also find that there is no need to rebid the contract at the end of each one year installment. At least one other jurisdiction has not required rebiddings of a contract where the city elected to extend the original contract for a specified period of time only, under the same terms and conditions as the original contract. *City of Lakeland, Florida v. Union Oil Co.*, 352 F.Supp. 758, 763–64 (M.D.Fla.1973). We find this approach to be eminently sensible. Like *City of Lakeland*, the one year installments in question are extensions of the original contract and are maintained under the same terms and conditions of the original contract. Any changes are technological and merely improve upon what was originally ordered as the original items become unavailable or obsolete.

It is clear to this court that one of the primary causes of this action is the appellant's belief that the Board paid too dearly for the equipment purchased—that it was out of date and could have been purchased at better prices. However, this is not just a contract for equipment, but a contract which includes training and maintenance as well as the hardware and software.[8] To change systems at the end of each installment would create a logistical nightmare. Not only would the cost be prohibitive, but the system would be unworkable. That is not the purpose of the legislation or the program. Moreover, while we agree with the Attorney General's assertion that it would be possible to get the hardware and software cheaper at a discount house, it would not include the training and subsequent support that is necessary in setting up such an ambitious system. Assume that everything was bought from a mail-order discount house mentioned by the Attorney General during oral argument. Then assume that the equipment breaks down, as is likely with children pounding on the keyboards. Will the discount house send a repairman to Mingo County, or McDowell County, or to any of the many rural schools served by this program? It is unlikely, and we will not question the judgment of the Board of Education in its choice in this case.

Since we have held that the one year contract with multiple renewals does not violate constitutional or statutory provisions, there is no need to rebid the contract every time a renewal occurs. Accordingly, we affirm the November 10, 1993, decision of the Circuit Court of Kanawha County and remand this case for entry of judgment in accordance with this opinion.

Affirmed and remanded.

---

8. One only has to read the renewal contracts to realize that with subsequent renewals, IBM has substituted newer models for the original computers listed in the purchase order once the original unit became obsolete and unavailable. Further, a careful review of the contract reveals that there is a maximum cost on the various products being purchased and a contractual requirement that the Board be afforded any company-wide reduction in the cost.